

Peter L. Altieri
Robert D. Goldstein
Michael Liberman
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York  10177
(212) 351-4500
Attorneys for Defendants
Angel Music Group Ltd. and Neil Moffit

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE MANAGEMENT GROUP, LLC, ANDREW
FOX, and LEE HEIMAN,

                    Plaintiffs,

          - against -

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civ. _____

**NOTICE OF REMOVAL**

**TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**:

       Defendants Angel Music Group ("Angel") and Neil Moffit (together the

"Removing Defendants") by their attorneys Epstein Becker & Green, P.C., hereby remove this

action from the Supreme Court of the State of New York, County of New York, to the United

States District Court for the Southern District of New York.

<u>**THE STATE COURT ACTION**</u>

       1.     Plaintiffs The Management Group, LLC ("TMG"), Andrew Fox and Lee

Heiman commenced this action in state court by filing their Summons and Complaint, annexed

as Exhibit A, with the Supreme Court of the State of New York, County of New York ("New

York Supreme") on or about February 27, 2008.  In the Complaint, Plaintiffs seek damages in

NY:2445374v3

the amount of no less than $10,000,000 for (a) breach of contract, (b) breach of fiduciary duty, (c) unfair competition, (d) conversion, (e) misappropriation of trade secrets, (f) tortuous interference with contractual and business relationships and (g) fraud. The complaint also seeks an accounting and permanent injunctive relief. Plaintiffs served the Removing Defendants with the Summons and Complaint on February 28, 2008. Upon information and belief, Plaintiffs have not yet served the other Defendants with the Summons and Complaint.

2.      On or about February 27, 2008, Plaintiffs moved by Order to Show Cause for a temporary restraining order and preliminary injunction based on the facts alleged in the Complaint. A copy of the Order to Show Cause, with supporting affidavits and exhibits, is annexed as Exhibit B. A copy of Plaintiffs' Memorandum of Law In Support of Their Order to Show Cause for Preliminary Injunctive Relief and For Interim Restraints is annexed as Exhibit C.

3.      On February 28, 2008, Justice Lowe of New York Supreme Court entered an order, annexed as Exhibit D, that (a) set a hearing date of March 6, 2008 for Plaintiffs' motion for a preliminary injunction, (b) provided that pending the hearing, Defendants would be temporarily restrained from using Plaintiff TMG's confidential and proprietary business information and from soliciting TMG's customers or employees, and (c) denying other relief sought by Plaintiffs.

## BASIS FOR REMOVAL

4.      This Court has original jurisdiction over the claims asserted in the State Court Action under 28 U.S.C. § 1332(a) because Plaintiffs and Defendants are citizens of different states and the amount in controversy is well over $75,000. Therefore, the State Court Action may be removed to this Court pursuant to 28 U.S.C. § 1441(a).

5.      Plaintiff TMG is a New York liability company with its principal place of business located in the State of New York. (Ex. A. ¶ 4)  Plaintiffs Andrew Fox and Lee Heiman reside in the State of New York. (Ex. A. ¶¶ 5, 6)

6.      Defendant Angel is a United Kingdom corporation with its principal place of business in Stratford Upon Avon, England.  Defendants Neil Moffit, Nick McCabe, and Jessie Angles reside in Henderson, Nevada.  Defendants Isabel Piaggi and Dan A. Vidal reside in Miami, Florida.  Defendant Anu Dhami resides in Las Vegas, Nevada.

8.      This Notice of Removal has been filed within the time provided by 28 U.S.C. § 1446(b).

9.      Defendants have not yet answered the Summons and Complaint, nor has the time to answer expired.

10.     Upon the filing of this Notice, the Removing Defendants will give written notice to Plaintiffs' attorney and will file a copy of this Notice with the Office of the Clerk, New York Supreme, and will comply with all other procedural mandates consistent with this application for removal.

11.     By filing this Notice, Defendants do not waive, and expressly reserve, any defenses which may be available to them, including the defense of lack of personal jurisdiction.

WHEREFORE, the Removing Defendants hereby remove the State Court Action now pending in New York Supreme.

Dated: New York, New York
      March 4, 2008

                        EPSTEIN BECKER & GREEN, P.C.

                        By: _____

                              Peter L. Altieri
                              Robert D. Goldstein
                              Michael Liberman
                        250 Park Avenue
                        New York, New York  10177
                        (212) 351-4500
                        Attorneys for Defendants
                        Angel Music Group Ltd. and Neil Moffet

Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

THE MANAGEMENT GROUP, LLC, ANDREW FOX, and LEE HEIMAN,

                                 Plaintiffs,

                 - against -

ANGEL MUSIC GROUP LTD., NEIL MOFFITT, NICK McCABE, JESSIE ANGLES, ANU DHAMI, ISABEL PIAGGI, and DAN A. VIDAL,

                               Defendants.

------------------------------------------------------------------x

**SUMMONS**

Index No.

Date Filed:

Plaintiffs designate New York County as the place of trial

The basis of venue is plaintiff The Management Group, LLC's residence in New York County

Plaintiff The Management Group, LLC resides at: 485 Madison Avenue New York, New York 10022

To the above-named defendants:

      YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on plaintiffs' attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York), and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       February 26, 2008

                           DAVIDOFF MALITO & HUTCHER LLP

                           By:_____

                             Larry Hutcher
                             Peter M. Ripin
                             *Attorneys for Plaintiffs*
                             605 Third Avenue
                             New York, New York 10158
                             (212) 557-7200

00370748

TO:    ANGEL MUSIC GROUP LTD.
       2904 W. Horizon Ridge Parkway, Suite 121
       Henderson, Nevada 89052

       NEIL MOFFITT
       2640 Mirabella Street
       Henderson, Nevada 89052

       NICK McCABE
       1504 Bay Road, #1104
       Miami Beach, FL 33139

       JESSIE ANGLES
       5724 SW 146 Court
       Miami, FL 33183

       ANU DHAMI
       104 Calle Cuervo
       San Clemente, CA 92672

       ISABEL PIAGGI
       6225 SW 87th Avenue
       Miami, FL 33173

       DAN A. VIDAL
       4510 NE 2nd Avenue #4
       Miami, FL 33137

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X
THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,                                    Index No.

                Plaintiffs,

         - against -

                                   **COMPLAINT**

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

                Defendants.

-------------------------------------------------------------------------x

      Plaintiffs, The Management Group, LLC ("TMG"), Andrew Fox ("Mr. Fox") and Lee

Heiman ("Mr. Heiman"), by and through their attorneys, Davidoff Malito & Hutcher LLP, by way

of Complaint against defendants Angel Music Group Ltd. ("Angel"), Neil Moffitt ("Moffitt"), Nick

McCabe ("McCabe"), Jessie Angles ("Angles"), Anu Dhami ("Dhami"), Isabel Piaggi ("Piaggi")

and Dan A. Vidal ("Vidal") (collectively, "Defendants"), allege and state as follows:

## NATURE OF THE ACTION

      1.    This action seeks to redress Defendants' shocking and blatant attack on plaintiffs'

business, as well as threats of physical violence directed against Mr. Fox. In short, plaintiffs'

former partner, Moffitt, has not only vowed to destroy plaintiffs' business by misappropriating and

exploiting plaintiffs' highly confidential and proprietary business information but has also

threatened Mr. Fox's very life. Simply put, Moffitt is a truly menacing figure and a bully who has

already physically assaulted Mr. Fox and bragged to Messrs. Fox, Heiman and their partners about

how he is engaged in money laundering and tax evasion in both the United States and the United

Kingdom.

2.    While plaintiffs and Moffitt were briefly partners, Moffitt and his co-conspirators McCabe, a former minority partner and employee of TMG, and Angles, Dhami, Piaggi and Vidal, former TMG employees, had access to plaintiffs' most confidential and proprietary information and trade secrets including, but not limited to, plaintiffs' business models and plans, plaintiffs' corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences. Armed with this highly proprietary and confidential information, these individual defendants and their business entity, Angel, have engaged in numerous acts of unfair competition by undercutting plaintiffs' prices, stealing plaintiffs' customers and soliciting plaintiffs' employees. Indeed, Moffitt has vowed to destroy plaintiffs' business "piece by piece."

3.    Plaintiffs seek equitable relief in the form of an injunction against Defendants' acts of business piracy, a protective order against Moffitt to protect against his threats of physical violence and campaign of harassment and slander and an accounting to enable plaintiffs to ascertain the extent of Defendants' unlawful conduct and the damages caused thereby. Plaintiffs also seek substantial monetary damages arising from the various Defendants': (a) breaches of contract; (b) breaches of fiduciary duty; (c) unfair competition; (d) conversion; (e) misappropriation of trade secrets; (f) tortious interference with contractual and business relationships; and (g) fraud.

## THE PARTIES

4.    Plaintiff, The Management Group, LLC, is a New York limited liability company with its principal place of business located at 485 Madison Avenue, New York, New York 10022.

5.    Plaintiff, Andrew Fox, is an individual who currently resides in the State of New York.

6.    Plaintiff, Lee Heiman, is an individual who currently resides in the State of New

00370756

-2-

York.

7.      Defendant, Angel Music Group Ltd., is upon information and belief, a United Kingdom corporation with its principal place of business located at 2904 W. Horizon Ridge Parkway, Suite 121, Henderson, Nevada 89052.

8.      Defendant, Neil Moffitt, is an individual who, upon information and belief, currently resides at 2640 Mirabella Street, Henderson, Nevada 89052.

9.      Defendant, Nick McCabe, is an individual who, upon information and belief, currently resides at 1504 Bay Road, #1104, Miami Beach, Florida 33139.

10.     Defendant Jessie Angles, is an individual who, upon information and belief, currently resides at 5724 SW 146 Court, Miami FL 33183.

11.     Defendant Anu Dhami, is an individual who, upon information and belief, currently resides at 104 Calle Cuervo, San Clemente, CA 92672.

12.     Defendant Isabel Piaggi is an individual who, upon information and belief, currently resides at 6225 SW 87th Avenue, Miami FL 33173.

13.     Defendant Dan A. Vidal is an individual who, upon information and belief, currently resides at 4510 NE 2nd Avenue #4, Miami FL 33137.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Angel, Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal pursuant to CPLR 302(a) because these defendants transact business within the State of New York.

15.     Additionally, this Court has personal jurisdiction over defendants Angel and Moffitt pursuant to contract, to wit: paragraph 14 of the Agreement dated as of March 1, 2007 by and among The Management Group, LLC, Angel Music Group Ltd, Neil Moffitt, Peter Haywood and

James Algate (the "Termination Agreement"). The Termination Agreement provides, in relevant part:

> Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, or otherwise relating to, this Agreement shall be brought [by any party against the other] in the Federal or state courts located in the County of New York, State of New York.

16.    Additionally, this Court has personal jurisdiction over defendant McCabe pursuant to contract, to wit: paragraph 13(f) of the Employment Agreement dated as of February 3, 2005, by and among The Management Group, LLC and Nick McCabe (the "Employment Agreement"), as modified by the parties thereto by letter dated as of June 20, 2007 (the "Modification Agreement"). The Employment Agreement provides, in relevant part:

> In the event of a dispute arising under this Agreement, the parties hereto irrevocably submit to the exclusive jurisdiction of the Federal and State courts located in the County and State of New York and each waives any objection thereto based on lack of venue, forum non conveniens or any similar-type grounds.

17.    Venue is proper in New York County pursuant to the contractual provisions cited in paragraphs 15 and 16 above, as well as pursuant to CPLR 503(a) because plaintiff The Management Group, LLC's principal place of business is located in the State of New York, New York County.

## FACTUAL ALLEGATIONS

### A.    TMG, Angel and Their Relationship

18.    TMG is a holding company which owns Track Entertainment ("Track"), a diversified entertainment, media and lifestyle company. Track's media properties include the world's leading online nightlife destination, Clubplanet.com, event and lifestyle oriented websites including NewYears.com, nocheLatina.com and CoolJunkie.com, and an online ticketing agent, Wantickets.com.

19.    Mr. Fox is the Chief Executive Officer and is an owner and operator of TMG and its

00370756                                           -4-

affiliated companies and websites.

20.    Mr. Heiman is the President and is an owner and operator of TMG and its affiliated companies and websites.

21.    Angel is an entertainment/event management company for dance music groups which is responsible for several large scale music festivals in the United Kingdom, including the "Global Gathering Festival."

22.    Upon information and belief, Moffitt is a citizen of the United Kingdom and the Chairman and Chief Executive Officer of Angel.

23.    In or about August 2005, Mr. Fox met Moffitt at the Global Gathering Festival and decided to work together to plan the first Global Gathering in the United States in March 2006.

24.    During the period leading up to the show, Mr. Fox began discussing a possible merger with Moffitt. Among other things, Messrs. Fox and Heiman believed that this acquisition would complement TMG's existing business and provide opportunities for expanding Angel's allegedly highly profitable festivals to other areas around the world, including the United States, thereby extending TMG's production business, services and relationships with global sponsors. In addition, ticketing for the festivals would be handled through Wantickets.com, TMG's proprietary ticketing property. Finally, the acquisition would extend the reach of TMG's other proprietary websites, including Clubplanet.com, and TMG's sales division which worked with Fortune 500 companies which advertised on these websites.

**B.    The Purchase Agreement**

25.    By an Agreement dated as of May 19, 2006 (the "Purchase Agreement"), TMG agreed to purchase all of Angel's shares from Moffitt and his two partners.

26.    After the merger, Messrs. Heiman, Fox and Moffitt each owned 23.75% of TMG and

served as TMG's sole Managers. Although Moffitt's partners executed employment agreements which TMG prepared for all three sellers, Moffitt failed to sign his agreement.

## C.    The Disastrous Post-Merger Events

27.    After the closing, Angel produced two smaller shows which were both unsuccessful and lost over 700,000 GBP.

28.    In addition, Angel's updated financial statements reflected a debt of 325,000 GBP allegedly incurred by Moffitt which had never been previously recorded on Angel's books and records. Obviously, Messrs. Heiman and Fox were shocked to learn of this. When they inquired about this alleged indebtedness, they were told that Moffitt had "deferred and altered" his payment schedule to Angel prior to the acquisition. Ultimately, Messrs. Heiman and Fox concluded that Moffitt had misappropriated more than $600,000 from Angel for his own benefit which he failed to previously disclose.

29.    To make matters worse, Moffitt grossly abused his expense account and spent more than $25,000 per month on personal expenses including airfare for his wife and paramour to visit him in Las Vegas where he was now living. At the same time, Moffitt began second-guessing TMG's decisions and criticizing almost every aspect of its operations. As TMG's cash flow grew progressively worse, Moffitt simply stopped working.

30.    By September 2006, TMG's losses totaled approximately $1 million.

31.    Even more ominously, however, Moffitt began bullying and threatening Mr. Fox. On one occasion, while dining at a London restaurant, Messrs. Heiman and Fox attempted to question Moffitt about his excessive spending and expenses and he erupted in a childish fit of rage and literally pushed Mr. Fox off his chair to the floor! Another time, when Mr. Fox was leaning over to put his briefcase into the trunk of his car, Moffitt pushed him into the trunk and said he

could make Mr. Fox "disappear." In addition, Moffitt regularly regaled Messrs. Heiman and Fox with stories of how he resorted to violence to achieve his goals. For example, he advised us that, on one occasion, he was able to "persuade" his ex-partner to terminate their business relationship by dangling him upside down over a banister with his head directly above a cement floor. He seemed particularly proud -- and repeatedly bragged -- about the fact that he did not pay taxes in either the U.S. or the U.K. In short, Moffitt considers himself "above the law."

32.    Prior to the merger, both TMG and Angel had been sued for trademark infringement by an individual claiming ownership of the name "Global Gathering" (the "Global Gathering Litigation"). Thereafter, as the Global Gathering Litigation grew more heated, TMG was forced to pay an exorbitant amount of legal fees – totaling more than $500,000 – to the attorneys whom Moffitt engaged to represent TMG.

33.    In short, the merger with Angel had turned into a nightmare. When Moffitt approached Messrs. Heiman and Fox in February 2007 and suggested that the parties terminate the Purchase Agreement and limit their relationship to a proposed joint venture in Canada, Messrs. Heiman and Fox happily agreed.

### D.    The Termination Agreement

34.    The Termination Agreement terminated the Purchase Agreement and "unwound" the transaction. However, the parties agreed that within sixty (60) days following the execution of the Termination Agreement, they would negotiate a joint venture arrangement in Canada in good faith using reasonable efforts. Pursuant to paragraph 5 of the Termination Agreement, the parties agreed that the work of the joint venture would be performed by a corporate entity owned equally by TMG and Angel, that this entity would employ both of TMG's Canadian employees, Stephane McGarry and Sol Shafer, and that Angel would reimburse TMG for start-up expenses totaling $32,000 prior

to any division of net profits.

35.     The parties also agreed that as part of the termination process certain restrictive

covenants were necessary.  Accordingly, in paragraph 11 of the Termination Agreement, the parties

agreed and acknowledged that they each had access to, and acquired, confidential information from

each other and that the use or disclosure of this information would be contrary to the interests of the

party whose information it was.  Thus, the Termination Agreement provided:

> The term "Confidential Information" as used in this Agreement
> means (a) confidential information of one of them, including
> without limitation, information received from third parties,
> including clients, under confidential conditions, and (b) other
> technical, business or financial information or trade secrets or
> proprietary information (including but not limited to, account
> records, client information, confidential plans for the creation
> or disposition of products, product development plans,
> marketing strategies and financial data and plans) …. The
> [Parties], on behalf of themselves and their Affiliates,
> understand and agree that such Confidential Information has
> been disclosed in confidence and for use only in the context of
> the Purchase Agreement and the consummation of the
> transactions contemplated thereunder.  The [P]arties on behalf
> of themselves and their Affiliates, understand and agree that (i)
> they will keep such Confidential Information confidential at all
> times hereafter, and (ii) they will not make use of Confidential
> Information on their own behalf, or on behalf of any third
> party.

(Emphasis added.)

36.     In addition, paragraph 9 of the Termination Agreement provided that during the term

of the joint venture and for twelve months thereafter, neither party would:

> (a) [E]ither directly or indirectly, for itself or for any other person
> or entity, (i) call upon, solicit or take away, any person then
> employed by either of them or (ii) knowingly employ any
> employee of either of them who voluntarily terminates such
> employment until 12 months have passed following the
> termination of such employment, unless such condition is waived
> by the Company in writing . . . .

> (b) [E]ither directly or indirectly, for itself or for any other person
> or entity, enter into any agreement, or assist any other person or
> entity in entering into any agreement or other arrangement
> regarding any projects or clients introduced by the Company or
> [Angel] by the other, or acquired or developed by the Joint
> Venture prior to or during the term of the Joint Venture unless the
> Company has ceased business relationships in relation to the
> project or the client prior to the solicitation.

37.    In paragraph 2 of the Termination Agreement, Angel agreed to use its best efforts to

secure the landlord's consent to TMG's assignment to Angel of the Las Vegas lease where Moffitt

had his office. In addition, Angel agreed to assume and be responsible for the payment of rent.

38.    In paragraph 3 of the Termination Agreement, Angel agreed to pay all future legal

fees in the Global Gathering Litigation and to use its best efforts to cooperate with TMG in its

efforts to extricate itself from that lawsuit. TMG agreed that Angel was the owner of the rights to

the name "Global Gathering."

### E.    Defendants' Breaches of the Termination Agreement and Other Wrongful Conduct Designed to Destroy TMG's Business

39.    Unfortunately, shortly after executing the Termination Agreement, Moffitt began

disavowing each of the obligations which he had agreed to. First, he no longer wanted to be part of

the Canadian joint venture and would not reimburse TMG for its start-up costs of $32,000. Instead,

Moffitt attempted to solicit the head of TMG's Canadian operation, Mr. McGarry, to work for

Angel. Although Mr. McGarry declined these entreaties, upon information and belief, Moffitt

continues to solicit Mr. McGarry. In total, TMG lost approximately $100,000 as a result of

Moffitt's breach of the joint venture provision.

40.    In addition, Angel breached its obligation to pay all future legal fees incurred in the

Global Gathering Litigation and to use its best efforts to extricate TMG from that lawsuit. On the

contrary, shortly after executing the Termination Agreement, TMG was advised that Angel had

reached its own separate settlement in the Global Gathering Litigation leaving TMG as the only

remaining defendant in a lawsuit alleging infringement of a trademark that TMG never owned! Needless to say, TMG did not receive advance notice of the settlement and was not informed of the settlement amount. To make matters worse, TMG's attorney was subsequently advised by plaintiff's attorney in the Global Gathering Litigation that Moffitt had offered to assist the plaintiff in the prosecution of this lawsuit against TMG!

41.    Not surprisingly, Angel also did not comply with its obligation to use its best efforts to secure the landlord's consent to the assignment of the Las Vegas lease and to assume and be responsible for the payment of the rent. On the contrary, shortly after executing the Termination Agreement, Moffitt advised Messrs. Heiman and Fox that he was moving out of the space and leaving them "on the hook" for the lease payments. Ultimately, TMG was required to pay the landlord $47,000 to terminate the lease.

42.    In June 2007, plaintiffs received a phone call from McCabe, TMG's Chief Creative Officer, who advised that he was resigning from TMG. McCabe had been a minority partner and worked for TMG for more than two years, was instrumental in developing creative campaigns for TMG's key client, Pepsi, and was the account manager for Bacardi, another one of TMG's most important clients. Since McCabe was such an important part of TMG's team, plaintiffs asked him to reconsider and offered him a six month extension on his Employment Agreement. Alternatively, plaintiffs reminded McCabe that if McCabe left, McCabe would be bound by the confidentiality, non-solicitation and non-competition provisions set forth in his Employment Agreement.

43.    In particular, paragraph 10 of McCabe's Employment Agreement provided:

You shall keep secret all confidential matters of Company, and shall not disclose them to anyone outside of Company, either during or after your employment with Company, except disclosure of confidential matters will be permitted: (i) to Company, its affiliates and their respective advisors; (ii) if such confidential

matters have previously become available to the public without your assistance or involvement; (iii) if required by any court or governmental agency or body or as otherwise required by law; (iv) if necessary to establish or assert your rights hereunder or under Company's Operating Agreement; or (v) if expressly consented to by Company.  You shall deliver promptly to Company upon termination of your employment, or at any time Company may request, all confidential memoranda, notes, records, reports and other documents (and all copies thereof) relating to the business of Company which you may then possess or have under your control.

44.    Paragraph 5(b) of McCabe's Employment Agreement provided:

During the Non-Solicitation Period (defined below), neither you nor any Related Person (defined below) shall knowingly, either directly or indirectly, for himself or for any other person or entity, (i) call upon, solicit or take away, or attempt to call upon, solicit or take away, any person then employed by Company or (ii) knowingly employ any employee of Company who voluntarily terminates such employment until twelve (12) months have passed following termination of such employment, unless such condition is waived by Company in writing. "Non-Solicitation Period" shall mean the period from the date hereof until twelve (12) months after the termination of your employment with Company. "Related Person" shall mean any person or entity who or which, directly or indirectly, is controlled by or otherwise affiliated with you or any person who is a member of your family.

45.    Paragraph 5(c) of McCabe's Employment Agreement provided:

During the term of your employment with Company and for the twelve (12) months following termination of such employment, neither you nor any Related Person shall knowingly, either directly or indirectly, for himself or for any other person or entity, enter into any agreement, or assist any other person or entity in entering into any agreement or other arrangement regarding any projects or clients introduced to Company or acquired or developed by Company or you prior to or during the term of your employment by Company.

46.    Shortly after plaintiffs reminded McCabe of these provisions, McCabe retained the

same lawyer who had represented Moffitt.  After several weeks of negotiations, TMG agreed to

modify McCabe's Employment Agreement to allow him to continue working with Bacardi.  TMG

based this very hard decision solely upon McCabe's representation that if TMG allowed McCabe to

since its budget for the Los Angeles event was much tighter than for previous events, it could not "accommodate" fees for both McCabe and TMG. In addition, McCabe stated that he would be "consulting and coordinating" the overall show and Bacardi would use a "small local vendor at a much lower fee" to handle production.

49.    Thereafter, however, TMG learned that Moffitt's partner, Peter Haywood, the Managing Director of Angel, had flown in from the UK and been hired as a "consultant" to oversee the November 2007 Los Angeles event and that Angel would be producing the entire March 2008 Miami event. In addition, TMG discovered that both McCabe and Angles were now employed by Angel. In short, Moffitt had solicited McCabe and Angles and thereafter fraudulently conspired with them to steal Bacardi from TMG.

50.    When TMG confronted Moffitt about this egregious betrayal, he was extremely arrogant and unapologetic. Moffitt stated that he was extremely "bitter" towards TMG and Mr. Fox, in particular; that TMG would regret ever "crossing swords" with Moffitt; and that he intended to "destroy" TMG and all of its affiliated properties. Significantly, both Moffitt and his co-conspirators, defendants McCabe, Angles, Dhami, Piaggi and Vidal, had access to TMG's most confidential and proprietary information and trade secrets, including, but not limited to, TMG's business models and plans, TMG's corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences. Armed with this and using highly proprietary and confidential information, Defendants are intent on destroying TMG's business piece-by-piece.

51.    First, knowing full well that TMG had actively sought to acquire NapkinNights.com, a nightlife website which directly competes with TMG's own website, Clubplanet.com, Moffitt did an end run around TMG and instead secured an interest in the website for Angel. In addition,

Moffitt entered into a joint venture with Trinity St., a ticketing company which Moffitt knew we were also seeking to do a joint venture with and which competes directly with TMG's own proprietary ticketing vehicle, Wantickets.com. Indeed, Moffitt solicited and stole TMG's sales representative for Wantickets.com, defendant Dhami, so that she could instead work directly for Trinity St. and NapkinNights. Significantly, Dhami is now using TMG's confidential information to wrongfully solicit its customers. In total, Moffitt wrongfully solicited seven (7), and eventually stole five (5), of TMG's employees in violation of the confidentiality and non-solicitation provisions of the Termination Agreement.

52.    Thus, in or about December 2007, Moffitt solicited and stole defendants Piaggi and Vidal, TMG's regional sales manager and national photo editor, respectively, both of whom had access to highly confidential information concerning TMG's customers and pricing for its proprietary website, CoolJunkie.com. Thereafter, Piaggi and Vidal went to work for Angel and are now using TMG's confidential information to wrongfully solicit its customers.

53.    In addition, Defendants engaged in numerous other acts of unfair competition by undercutting TMG's prices and soliciting and/or stealing TMG's customers and employees. Indeed, only recently, the joint venture between Angel and Trinity St. used TMG's confidential information to steal Tiesto, a $1,000,000 client of TMG. In short, Defendants' conspiracy to exploit and misappropriate TMG's confidential information and steal TMG's business was so brazen that Angel submitted the following entry to Wikipedia, the free online encyclopedia:

> In June of 2006, [Angel] merged with the United States company Track Entertainment, after partnering with them on the successful US version of the Global Gathering festival in March of 2006. The merger gave them a solid footprint in all the major markets in the United States. The joint venture was short-lived and [Angel] now competes directly with Track through new joint ventures with the photo community web site Napkin Nights,

event producers Live Nation, and the interactive services
company Trinity Street.

(Emphasis added.)

54.    As if this heinous business piracy were not enough, Moffitt has also made threatened

Mr. Fox's life; slandered and disparaged Messrs. Heiman and Fox to their business associates; and

taunted Messrs. Heiman and Fox with emails in which he reiterated his intention of destroying

TMG's business.

## AS AND FOR A FIRST CAUSE OF ACTION
### (BY FOX AND HEIMAN AGAINST MOFFITT FOR A PERMANENT INJUNCTION)

55.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1"

through "54" hereof as if set forth in full herein.

56.    Moffitt's physically violent conduct toward Mr. Fox, and his unlawful threats, have

and will continue to cause irreparable harm to Messrs. Fox and Heiman.

57.    By reason of the foregoing, Messrs. Fox and Heiman are entitled to permanent

injunctive relief directing Moffitt to:  (a) stay away from Messrs. Fox and Heiman, their wives,

children and/or other family members at any and all locations, including, but not limited to, their

homes, places of business, schools and/or day care centers; (b) refrain from communicating with

Messrs. Fox and Heiman, their wives, children and/or other family members by any means

whatsoever, including, but not limited to, mail, facsimile, email, telephone and voicemail; (c)

refrain from assaulting, stalking, harassing, menacing, recklessly endangering, intimidating,

threatening or annoying Messrs. Fox and Heiman, their wives, children and/or other family

members; and (d) refrain from making any statements, whether written or oral, public or private,

that disparage, denigrate or defame Messrs. Fox and Heiman, their wives, children and/or other

family members.

58.    Messrs. Fox and Heiman have no adequate remedy at law.

## AS AND FOR A SECOND CAUSE OF ACTION
## (BY TMG AGAINST ALL DEFENDANTS FOR A PERMANENT INJUNCTION)

59.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "58" hereof as if set forth in full herein.

60.    Pursuant to the Termination Agreement, Angel and Moffitt were prohibited from unfairly competing with TMG, soliciting its clients and employees, and disclosing its confidential and proprietary information.

61.    Pursuant to his Employment Agreement, McCabe was similarly prohibited from unfairly competing with TMG, soliciting its clients and employees, and disclosing its confidential and proprietary information.

62.    Similarly, under New York common law, all of the Defendants were prohibited from unfairly competing with TMG by using its confidential and proprietary information to secure an advantage over TMG.

63.    As set forth above, Angel and Moffitt have breached their contractual, fiduciary and common law obligations by: (a) soliciting TMG's employees, including but not limited to, Stephane McGarry and defendants McCabe, Angles, Dhami, Piaggi and Vidal; (b) unfairly competing with TMG, including but not limited to, through the acquisition of NapkinNights.com and through the joint venture with Trinity Street; and (c) using TMG's confidential and proprietary information and trade secrets to compete with TMG and to destroy TMG's business, including but not limited to undercutting TMG's prices, stealing customers and stealing business opportunities.

64.    As also set forth above, defendants McCabe, Angles, Dhami, Piaggi and Vidal breached their contractual, fiduciary and/or common law obligations by:  (a) soliciting TMG's employees; (b) unfairly competing with TMG through their employment with Angel; and (c) using

TMG's confidential and proprietary information and trade secrets to injure and destroy TMG's business including, but not limited to, assisting his current employer, Angel, to undercut TMG's prices, steal TMG's customers and steal TMG's business opportunities.

65.    TMG has no adequate remedy at law.

66.    By reason of the foregoing, TMG is entitled to a permanent injunction enjoining and restraining Defendants from: (a) soliciting TMG's employees; (b) unfairly competing with TMG; and (c) using TMG's confidential and proprietary information.

## AS AND FOR A THIRD CAUSE OF ACTION
## (BY TMG AGAINST ANGEL, MOFFITT AND MCCABE FOR BREACH OF CONTRACT)

67.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "66" hereof as if set forth in full herein.

68.    The Termination Agreement is a valid and binding contract that seeks to protect TMG's property, confidential information, trade secrets, customer and personnel relationships, and good will.

69.    McCabe's Employment Agreement is a valid and binding contract that seeks to protect TMG's property, confidential information, trade secrets, customer and personnel relationships, and good will.

70.    Pursuant to the Termination Agreement, Angel and Moffitt were prohibited from unfairly competing with TMG, soliciting its customers, soliciting its employees and using or disclosing TMG's confidential and proprietary information and trade secrets.

71.    Pursuant to the Employment Agreement, McCabe was prohibited from unfairly competing with TMG, soliciting its customers (except, pursuant to the Modification Agreement, Bacardi), soliciting its employees and using or disclosing TMG's confidential and proprietary

information and trade secrets.

72.    Angel and Moffitt have breached and continue to be in breach of the Termination Agreement, by reason of their having: (a) solicited TMG's employees; (b) unfairly competed with TMG; and (c) used TMG's confidential and proprietary information.  Additionally, Angel has breached and continues to be in breach of the Termination Agreement by reason of its having: (i) failed to proceed with the Canadian Joint Venture; (ii) failed to reimburse TMG for the start-up expenses incurred in connection with the Canadian Joint Venture; (iii) failed to pay legal fees incurred by TMG in the Global Gathering Litigation; (iv) failed to use its best efforts to extricate TMG from the Global Gathering Litigation; and (v) failed to secure the landlord's consent to the assignment of the Las Vegas lease and to assume and be responsible for the payment of the rent.

73.    McCabe has breached and continues to be in breach of his Employment Agreement by reason of his having: (a) solicited TMG's customers and employees; (b) unfairly competed with TMG; and (c) used TMG's confidential and proprietary information.

74.    As a direct and proximate result of Angel, Moffitt and McCabe's breaches of their respective contracts, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of confidentiality of its trade secrets and other damages.

75.    By virtue of the foregoing, Angel, Moffitt and McCabe are further liable to TMG for compensatory damages in an amount to be determined at trial, but in no event less than $10,000,000.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (BY TMG AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY)

76.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "75" hereof as if set forth in full herein.

77.     At all relevant times, defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal owed fiduciary duties of fidelity and loyalty to TMG and, additionally, were obligated to act in good faith and to deal fairly with TMG.

78.     Defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal breached their fiduciary duties by, inter alia, misappropriating, and then using, TMG's confidential and proprietary information and trade secrets learned while employed by TMG.

79.     As a direct and proximate result of the wrongful conduct of defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal, TMG suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of confidentiality of its trade secrets and other damages.

80.     By virtue of the foregoing, TMG is entitled to receive an amount equal to the total remuneration TMG paid to defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal during their employment with TMG. Additionally, defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (BY TMG AGAINST ANGEL
### FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY)

81.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "80" hereof as if set forth in full herein.

82.     As employees of TMG, defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal owed TMG a duty of fidelity and loyalty.

83.     The theft by defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal of TMG's confidential information and use of such information to set up or further a competing business constitutes breaches of their fiduciary duties to TMG.

84.    Angel knew about the theft of TMG's confidential information by defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal and participated in such breach of fiduciary duties.

85.    By virtue of the foregoing, Angel is liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (BY TMG AGAINST ALL DEFENDANTS FOR UNFAIR COMPETITION)

86.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "85" hereof as if set forth in full herein.

87.    Through the wrongful conduct of defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal, as more fully described above, Angel is engaged in an unfair method of competition and/or deceptive acts or practices.

88.    As a results of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

89.    By virtue of the foregoing, Defendants are liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (BY TMG AGAINST ALL DEFENDANTS FOR CONVERSION)

90.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "89" hereof as if set forth in full herein.

91.    As described above, Defendants have exercised and continue to exercise unauthorized dominion and control over TMG's property, including confidential and proprietary information belonging to TMG.

92.    TMG has an immediate right to possession of such property.

93.    As a result of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

94.    By virtue of the foregoing, Defendants are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### (BY TMG AGAINST ALL DEFENDANTS
### FOR MISAPPROPRIATION OF TRADE SECRETS)

95.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "94" hereof as if set forth in full herein.

96.    TMG's business models and plans, corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences constitute trade secrets and are subject to protection.

97.    This information was kept secret by TMG and was not generally known or available to third-parties to whom it would provide actual or potential economic value.

98.    This information was subjected to reasonable security measures to maintain secrecy and confidentiality.

99.    As described above, Defendants misappropriated TMG's trade secrets by acquiring such trade secrets through improper means and then improperly using such trade secrets.

100.    As a direct and proximate cause of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

101.    By virtue of the foregoing, TMG is entitled to immediate injunctive relief, and

Defendants are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR A NINTH CAUSE OF ACTION
## (BY TMG AGAINST ALL DEFENDANTS FOR TORTIOUS
## INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS)

102.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "101" hereof as if set forth in full herein.

103.    As described above, TMG has long-standing contractual and/or business relationships with its clients and personnel.  Further, at the time of the wrongful acts committed by Defendants, TMG had a tangible expectancy of continuing the relationships which TMG had developed with those clients and personnel.

104.    At all relevant times herein, Defendants were aware of those business relationships.

105.    Defendants intentionally and tortiously, with improper motive and without justification or excuse, interfered and/or are planning or attempting to interfere with those relationships.

106.    TMG has suffered damages due to Defendants' conduct because but for Defendants' inducement, certain TMG personnel and clients including, but not limited to, Bacardi would not have terminated their relationships with TMG and TMG would have obtained contracts with other clients and personnel with whom TMG had prospective business relationships.

107.    Defendants have specifically interfered with TMG's prospective business relationships and have damaged the goodwill that TMG has worked to achieve.

108.    As a result of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

109.    By virtue of the foregoing, TMG is entitled to immediate injunctive relief and Defendants are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR A TENTH CAUSE OF ACTION
## (BY TMG AGAINST ALL DEFENDANTS FOR *PRIMA FACIE* TORT)

110.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "108" hereof as if set forth in full herein.

111.    Defendants, acting in concert and each with the aid of the others, have conspired to cause, and have in fact caused, injury to TMG through all of the wrongful conduct described above.

112.    Defendants have undertaken such conduct with the intent to cause injury to TMG.

113.    Defendants' conduct described herein is generally culpable and not justifiable under the circumstances.

114.    As a direct and proximate result of Defendants' tortious conduct, TMG has suffered damages.

115.    As such, Defendants are liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## (BY TMG AGAINST McCABE FOR FRAUDULENT INDUCEMENT TO CONTRACT)

116.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "115" hereof as if set forth in full herein.

117.    In order to induce TMG to enter into the Modification Agreement, McCabe made the representations to TMG detailed in paragraph 46 above.

118.    Each of the representations made by McCabe were material to TMG's decision to enter into the Modification Agreement.

119.    McCabe made the representations with the intent that TMG would rely upon them in determining to enter into the Modification Agreement.

120.    McCabe's representations were false, as described above in paragraphs 48 through 49.

121.    McCabe was aware of the falsity of his representations at the time that the representations were made.

122.    TMG actually relied on McCabe's representations when it entered into the Modification Agreement. TMG's reliance on McCabe's representations was reasonable in that TMG had no knowledge of the falsity of the representations and had no reason to know that the representations were false.

123.    McCabe's actions in making the above misrepresentations to TMG as an inducement to enter into the Modification Agreement was malicious, oppressive and fraudulent.

124.    Because of McCabe's fraud, TMG is entitled to rescission of the Modification Agreement.

125.    By reason of McCabe's fraudulent inducement of TMG to enter into the Modification Agreement, TMG has sustained and will continue to sustain substantial damages consisting of the loss of Bacardi as a client of TMG and of TMG's out-of-pocket expenses incurred in connection with the negotiation, drafting and execution of the Modification Agreement.

126.    As a direct and proximate result of McCabe's fraudulent conduct, the Modification Agreement should be rescinded and TMG awarded compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

127.    TMG has no adequate remedy at law.

## AS AND FOR AN TWELFTH CAUSE OF ACTION
## (BY TMG AGAINST ALL DEFENDANTS FOR AN ACCOUNTING)

128.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "127" hereof as if set forth in full herein.

129.    As set forth above, Defendants have all participated in, or been the beneficiaries of, wrongful conduct committed by the Defendants against TMG.

130.    By reason of the foregoing, Defendants are required to account to TMG for the profits realized at TMG's expense including all revenue generated by Defendants in connection with their theft and misuse of TMG's confidential and proprietary information and trade secrets, so that TMG can determine the totality of its damages.

131.    TMG has no adequate remedy at law for the relief requested by this cause of action.

**WHEREFORE**, plaintiffs, The Management Group, LLC, Andrew Fox and Lee Heiman, demand judgment against defendants, Angel Music Group Ltd., Neil Moffitt, and Nick McCabe, Jessie Angles, Anu Dhami, Isabel Piaggi, and Dan A. Vidal, as follows:

(a)    On the first cause of action for a permanent injunction, enjoining, restraining and/or directing Moffitt to:  (a) stay away from Messrs. Fox and Heiman, their wives, children and/or other family members at any and all locations, including, but not limited to, their homes, places of business, schools and/or day care centers; (b) refrain from communicating with Messrs. Fox and Heiman, their wives, children and/or other family members by any means whatsoever, including, but not limited to, mail, facsimile, email, telephone and voicemail; (c) refrain from assaulting, stalking, harassing, menacing, recklessly endangering, intimidating, threatening or annoying Messrs. Fox and Heiman, their wives, children and/or other family members; and (d) refrain from making any statements, whether written or oral, public or private, that disparage, denigrate or defame Messrs. Fox and/or Heiman, their wives, children and/or other family members.

(b)    On the second cause of action for a permanent injunction, enjoining and restraining Defendants from: (a) soliciting TMG's employees; (b) unfairly competing with TMG; and (c) using TMG's confidential and proprietary information;

(c)    On the third cause of action for breach of contract, awarding TMG compensatory damages against Angel, Moffitt and McCabe according to the proof, but in any event, in an amount no less than $10,000,000;

(d)    On the fourth cause of action for breach of fiduciary duty, awarding TMG compensatory and punitive damages against defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(e)    On the fifth cause of action for aiding and abetting breach of fiduciary duty, awarding TMG compensatory and punitive damages against defendant Angel according to the proof, but in any event, in an amount no less than $10,000,000;

(f)    On the sixth cause of action for unfair competition, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(g)    On the seventh cause of action for conversion, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(h)    On the eighth cause of action for misappropriation of trade secrets, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(i)     On the ninth cause of action for tortious interference with contractual and business relationships, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(j)     On the tenth cause of action for *prima facie* tort, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(k)     On the eleventh cause of action for fraudulent inducement to contract, rescinding the Modification Agreement and awarding TMG compensatory and punitive damages against McCabe, according to the proof, but in any event, in an amount no less than $10,000,000;

(l)     On the twelfth cause of action for an accounting, requiring Defendants to account to TMG for the total amount of revenue generated by Defendants in connection with their theft and misuse of TMG's confidential and proprietary information and trade secrets; and

(n)     All together with prejudgment interest, the costs and disbursements of this action, including reasonable attorneys' fees, and for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       February 26, 2008

DAVIDOFF MALITO & HUTCHER LLP

By: _____

Larry Hutcher
Peter M. Ripin

*Attorneys for Plaintiffs*

605 Third Avenue
New York, New York 10158
(212) 557-7200

Exhibit B

At an IAS Part _____ of the Supreme Court of the
State of New York held in and for the County of
New York at the Courthouse located at 60 Centre
Street, New York, NY on the _____ of February,
2008.

P R E S E N T :

    HON.

               J.S.C.

----------------------------------------------------------------------x

THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,              Index No.

                 Plaintiffs,

       - against -

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,   **ORDER TO SHOW CAUSE**
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

              Defendants.

----------------------------------------------------------------------x

     UPON reading and filing the annexed Affidavit of Andrew Fox, sworn to February 26, 2008,

and the exhibits annexed thereto, and Affidavit of Lee Heiman, sworn to February 26, 2008, and the

complaint filed in this action by plaintiffs The Management Group, LLC ("TMG"), Andrew Fox and Lee

Heiman (collectively, "Plaintiffs"), it is

     ORDERED, that defendants Angel Music Group Ltd., Neil Moffitt ("Moffitt"), Nick

McCabe, Jessie Angles, Anu Dhami, Isabel Piaggi and Dan A. Vidal (collectively, "Defendants"),

or their attorneys, show cause before this Court at I.A.S. Part __, Room ___, at the Courthouse located at

60 Centre Street, New York, New York, on the ____ day of _____, 2008 at _____, or as soon

thereafter as counsel may be heard, why an order should not be entered pursuant to Article 63 of the

CPLR i) preliminarily enjoining Defendants, directly or indirectly, and whether acting alone or in concert

00370877

with others, including any officer, agent, employee and/or representative of any of the Defendants, until further Order of this Court, from using and/or continuing to use TMG's confidential and proprietary business information and from directly or indirectly soliciting any of TMG's present or former customers or employees and ii) preliminarily enjoining Moffitt, directly or indirectly, and whether acting alone or in concert with others including his officers, agents, employees and/or representatives, until further Order of this Court, from assaulting, stalking, menacing, recklessly endangering, intimidating, threatening, annoying, contacting, communicating, slandering or defaming plaintiffs Andrew Fox and Lee Heiman and their respective wives, children, other family members, friends and associates; and it is further

ORDERED, that pending the hearing of this motion, i) Defendants, directly or indirectly, and whether acting alone or in concert with others, including any officer, agent, employee and/or representative of any of the Defendants, be and they hereby are temporarily restrained and enjoined from using and/or continuing to use TMG's confidential and proprietary business information and from directly or indirectly soliciting any of TMG's present or former customers or employees and ii) Moffitt, directly or indirectly, and whether acting alone or in concert with others including his officers, agents, employees and representatives, be and hereby is temporarily restrained and enjoined from assaulting, stalking, menacing, recklessly endangering, intimidating, threatening, annoying, contacting, communicating, slandering or defaming plaintiffs Andrew Fox and Lee Heiman and their respective wives, children, other family members, friends and associates; and it is further

ORDERED, that sufficient reason appearing therefor, let service of a copy of this Order to Show Cause, together with the papers upon which it is based, on Defendants or their counsel, in accordance with the service provisions of the CPLR, on or before the _____ day of February, 2008, be deemed good and sufficient service herein; and it is further

00370877

- 2 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------------------------X

THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,

                          Plaintiffs,      :        Index No.

                -against-         :       **AFFIDAVIT**

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

                          Defendants.   :

-----------------------------------------------------------------------X

STATE OF NEW YORK  )
                      ) ss.:
COUNTY OF NEW YORK  )

          LEE HEIMAN, being duly sworn, deposes and says:

    1.     I am a plaintiff in the above captioned action and the President of plaintiff The

Management Group, LLC and am familiar with the facts and circumstances set forth below.  I

submit this affidavit in support of the instant application for i) a temporary restraining order and a

preliminary injunction enjoining and restraining defendants from using and/or continuing to use our

confidential and proprietary business information and from directly or indirectly soliciting any of

our present or former customers or employees and ii) an order of protection prohibiting defendant

Neil Moffitt and/or his representatives from assaulting, stalking, menacing, recklessly endangering,

intimidating, threatening, annoying, contacting, communicating, slandering or defaming either

myself or my partner, plaintiff Andrew Fox, and our respective family members, friends and

associates.

    2.     I have read and reviewed the accompanying Affidavit of Andrew Fox, sworn to on

February 26, 2008. All of the facts and assertions set forth therein are true and correct to the best of

my knowledge.

3.    For the reasons set forth in Mr. Fox's affidavit and the accompanying memorandum

of law, we urgently require the immediate equitable intervention of this Court.

WHEREFORE, I respectfully request that the motion be granted in its entirety.

LEE HEIMAN

Sworn to before me this
26th day of February, 2008

MARGARET L. DONAGHTON
NOTARY PUBLIC
STATE OF NEW YORK
NO. 01CO4972598
QUALIFIED IN WESTCHESTER COUNTY
COMMISSION EXPIRES OCTOBER, 20

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------x
THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,                                    Index No.

                        Plaintiffs,

            - against -

                                                    **AFFIDAVIT**

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

                        Defendants.

-------------------------------------------------------------------x

STATE OF NEW YORK     )
                      )  ss.:
COUNTY OF NEW YORK    )

            ANDREW FOX, being duly sworn, deposes and says:

       1.    I am a plaintiff in the above captioned action and the Chief Executive Officer of

plaintiff The Management Group, LLC ("TMG" or the "Company") and am familiar with the facts

and circumstances set forth below. I submit this affidavit in support of the instant application for i)

a temporary restraining order and a preliminary injunction enjoining and restraining defendants

Angel Music Group Ltd. ("AMG"), Neil Moffitt ("Moffitt"), Nick McCabe ("McCabe"), Jessie

Angles ("Angles"), Anu Dhami ("Dhami"), Isabel Piaggi ("Piaggi") and Dan A. Vidal ("Vidal")

(collectively, "Defendants") from using and/or continuing to use our confidential and proprietary

business information and from directly or indirectly soliciting any of our present or former

customers or employees and ii) an order of protection prohibiting Moffitt and/or his representatives

from assaulting, stalking, menacing, recklessly endangering, intimidating, threatening, annoying,

contacting, communicating, slandering or defaming either myself or my partner, plaintiff Lee

Heiman, and our respective family members, friends and associates.

00370652.2

## PRELIMINARY STATEMENT

2.    At the very outset, I respectfully submit that the within request for injunctive relief is both urgent and compelling. In short, Defendants are not only seeking to destroy our business by misappropriating and exploiting our highly confidential and proprietary business information but Moffitt has also threatened my very life! Simply put, Moffitt is a truly menacing figure and a bully who has already physically assaulted me and bragged to me and my partners about how he is engaged in money laundering and tax evasion in both the United States and the United Kingdom.

3.    Simply put, Moffitt and his co-conspirators McCabe, our former minority partner and employee, and Angles, Dhami, Piaggi and Vidal, our former employees, had access to our most confidential and proprietary information and trade secrets including, but not limited to, our business models and plans, our corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences. Although we agreed to dissolve our business relationship with Moffitt and his company, AMG, by entering into a Termination Agreement with restrictive covenants prohibiting the use of our confidential information, they have simply ignored these provisions and continued violating our rights. In addition, McCabe has flagrantly breached similar restrictive covenants contained in his employment agreement and Angles, Dhami, Piaggi and Vidal have breached their common law fiduciary duties to TMG by using its confidential and proprietary information to wrongfully solicit its customers.

4.    Armed with this highly confidential and proprietary information, Defendants have engaged in numerous acts of unfair competition by misappropriating our trade secrets, undercutting our prices, stealing our customers and soliciting our employees. Indeed, Moffitt has vowed to destroy our business "piece-by-piece".

5.    As recently as last week, we learned that Moffitt had stolen one of our most important clients, Tiesto, which generates approximately $1,000,000 in revenues and that McCabe

was meeting with another one of our clients, Vidal Partners, in a further wrongful attempt to steal its business. Without immediate injunctive relief, defendants will not rest until our business and precious goodwill are irreparably destroyed. Even more ominously, without an order of protection, we fear that our very lives and that of our families may be endangered. I urge this Court to immediately grant our application for this emergency relief.

## THE ACTION

6.    Simultaneously with this application, plaintiffs have filed a summons and complaint against the defendants seeking, *inter alia*, a permanent injunction.

## FACTS

7.    TMG is a holding company which owns Track Entertainment ("Track"), a diversified entertainment, media and lifestyle company. Track's proprietary media properties include the world's leading online nightlife destination, Clubplanet.com, event and lifestyle oriented websites including NewYears.com, nocheLatina.com and CoolJunkie.com, and an online ticketing agent, Wantickets.com. TMG and its affiliated companies and websites are owned and operated by myself and Mr. Heiman, TMG's President.

8.    Upon information and belief, Moffitt is a citizen of the United Kingdom and the Chairman and CEO of AMG, an event management company for dance music groups which is responsible for several large scale music festivals in the UK including Global Gathering. In August 2005, I met Moffitt at the Global Gathering Festival and decided to work together with him to plan the first Global Gathering in the United States in March 2006.

9.    During the period leading up to the show, I began discussing a possible merger with Moffitt. Among other things, we believed that this acquisition would complement our existing business and provide opportunities for expanding AMG's allegedly highly profitable festivals to other areas around the world, including the United States, thereby extending our production

business, services and relationships with global sponsors. In addition, ticketing for the festivals would be handled through Wantickets.com, our proprietary ticketing property. Finally, the acquisition would extend the reach of our other proprietary websites, including Clubplanet.com, and our sales division which works with Fortune 500 companies advertising on these websites.

**The Purchase Agreement**

10.    In an Agreement, dated May 19, 2006 (the "Purchase Agreement") (Exh. A), TMG agreed to purchase all of AMG's shares from Moffitt and his two partners. After the merger, Mr. Heiman, myself and Moffitt each owned 23.75% of the Company and served as the sole Managers. Although Moffitt's partners both executed employment agreements which we prepared for each of the sellers, Moffitt failed to sign his agreement.

11.    After the closing, AMG produced two smaller shows which were both unsuccessful and lost over 700,000 GBP. In addition, AMG's updated financial statements reflected a debt of 325,000 GBP allegedly incurred by Moffitt which had never been previously recorded on AMG's books and records. Obviously, we were shocked to learn of this. When we inquired about this alleged indebtedness, we were told that Moffitt had "deferred and altered" his payment schedule to AMG prior to the acquisition. Ultimately, we concluded that Moffitt had misappropriated more than $600,000 from AMG for his own benefit which he failed to disclose to us.

12.    To make matters worse, Moffitt grossly abused his expense account and spent more than $25,000 per month on personal expenses including airfare for his wife and girlfriend to visit him in Las Vegas where he was now living. At the same time, Moffitt began second-guessing the Company's decisions and criticizing almost every aspect of its operations. As AMG's cash flow grew progressively worse, Moffitt simply stopped working. By September 2006, AMG's losses totaled approximately $1 million.

13.    Even more ominously, however, Moffitt began bullying and threatening me. On one occasion, while dining at a London restaurant, we attempted to question Moffitt about his excessive spending and expenses and he erupted in a childish fit of rage and literally pushed me off my chair onto the floor! Another time, when I was leaning over to put my briefcase into the trunk of my car, he pushed me into the trunk and said he could "make me disappear." In addition, Moffitt regularly regaled us with stories of how he resorted to violence to achieve his goals. For example, he advised us that, on one occasion, he was able to "persuade" his ex-partner to terminate their business relationship by hanging him upside down over a banister with his head dangling directly above a cement floor. He seemed particularly proud -- and repeatedly bragged -- about the fact that he did not pay taxes in either the U.S. or the U.K. In short, Moffit considers himself "above the law."

14.    Prior to the merger, both our company and AMG were sued in a trademark infringement action by an individual claiming ownership of the name "Global Gathering" (the "Global Gathering Litigation"). Thereafter, as the Global Gathering Litigation grew more heated, we were forced to pay an exorbitant amount of legal fees -- totaling more than $500,000 -- to the attorneys who Moffitt engaged to represent us. In short, the merger with AMG had turned into a nightmare. When Moffitt approached us in February 2007 and suggested that we terminate the Purchase Agreement and limit our relationship to a proposed joint venture in Canada, we happily agreed.

### The Termination Agreement

15.    By agreement, dated March 1, 2007 (the "Termination Agreement") (Exh. B), the parties terminated the Purchase Agreement and "unwound" the transaction. However, the parties agreed that within sixty (60) days following the execution of the Termination Agreement, they would negotiate a joint venture arrangement in Canada in good faith using reasonable efforts. Pursuant to paragraph 5 of the Termination Agreement, the parties agreed that the work of the joint

venture would be performed by a corporate entity owned equally by us and AMG, that this entity would employ both of our Canadian employees Stephane McGarry and Sol Shafer, and would reimburse us for start-up expenses totaling $32,000 prior to any division of net profits.

16.    We also agreed that, as part of the separation, certain restrictive covenants were necessary. Accordingly, in paragraph 11 of the Termination Agreement, the parties agreed and acknowledged that they had each had access to, and acquired, confidential information from each other and that the use or disclosure of this information would be contrary to the interests of the party whose information it was. Thus, the Termination Agreement provided:

> The term "Confidential Information" as used in this Agreement means (a) confidential information of one of them, including without limitation, information received from third parties, including clients, under confidential conditions, and (b) other technical, business or financial information or trade secrets or proprietary information (including, but not limited to, account records, client information, confidential plans for the creation or disposition of products, product development plans, marketing strategies and financial data and plans)... The [Parties], on behalf of themselves and their Affiliates, understand and agree that such Confidential Information has been disclosed in confidence and for use only in the context of the Purchase Agreement and the consummation of the transactions contemplated thereunder. The [P]arties on behalf of themselves and their Affiliates, understand and agree that (i) they will keep such Confidential Information confidential at all times hereafter, and (ii) they will not make use of Confidential Information on their own behalf, or on behalf of any third party. (Exh. B, ¶ 11) (emphasis added)

17.    In addition, paragraph 9 of the Termination Agreement provided that during the term of the joint venture and for twelve months thereafter, neither party would:

> (a) [E]ither directly or indirectly, for itself or for any other person or entity, (i) call upon, solicit or take away, or attempt to call upon, solicit or take away, any person then employed by either of them or (ii) knowingly employ any employee of either of them who voluntarily terminates such employment until 12 months have passed following termination of such employment, unless such condition is waived by Company in writing...

> (b)  [E]ither directly or indirectly, for itself or for any other person
> or entity, enter into any agreement, or assist any other person or
> entity in entering into any agreement or other arrangement
> regarding any projects or clients introduced to the Company or
> AMG by the other, or acquired or developed by the Joint Venture
> prior to or during the term of the Joint Venture unless the
> Company has ceased business relationships in relation to the
> project or the client prior to the solicitation. (Exh. B, ¶ 9)

18.    In paragraph 2 of the Termination Agreement, AMG agreed to use its best efforts to secure the landlord's consent to our assignment to AMG of the Las Vegas office lease where Moffitt worked.  In addition, AMG agreed to assume and be responsible for the payment of rent. We agreed that AMG was the owner of the rights to the name "Global Gathering" and, in paragraph 3 of the Termination Agreement, AMG agreed to pay all future legal fees in the Global Gathering Litigation and to use its best efforts to cooperate with us in our efforts to extricate ourselves from this lawsuit.

## Defendants' Breaches and Attempt To Destroy Our Business

19.    Unfortunately, shortly after executing the Termination Agreement, Moffitt began disavowing each of the obligations which he had agreed to.  First, he no longer wanted to be part of the Canadian joint venture and would not reimburse us for our start-up costs of $32,000.  Instead, he attempted to solicit the head of our Canadian operation, Mr. McGarry, to work for AMG.  Although Mr. McGarry declined these entreaties, upon information and belief, Moffitt continues to solicit Mr. McGarry.  In total, we lost approximately $100,000 as a result of Moffitt's breach of the joint venture provision.

20.    In addition, AMG breached its obligation to pay all future legal fees in the Global Gathering Litigation and to use its best efforts to remove us from the lawsuit.  On the contrary, shortly after executing the Termination Agreement, we were advised that AMG had reached its own separate settlement in the Global Gathering Litigation leaving us as the only remaining defendant to

defend a lawsuit alleging infringement of a trademark which we never owned! Needless to say, we did not receive advance notice of the settlement and were not informed of the settlement amount. To make matters worse, our attorney was subsequently advised by plaintiff's attorney in the Global Gathering Litigation that Moffitt had offered to assist the plaintiff in the prosecution of this lawsuit against us!

21.    Not surprisingly, AMG also did not comply with its obligation to use its best efforts to secure the landlord's consent to the assignment of the Las Vegas lease and to assume and be responsible for the payment of rent. On the contrary, shortly after executing the Termination Agreement, Moffitt advised us that he was moving out of the space and leaving us "on the hook" for the lease payments. Ultimately, we were required to pay the landlord $47,000 to terminate the lease.

22.    In June 2007, our Chief Creative Officer, defendant McCabe, advised us that he was resigning. McCabe was a minority partner and had worked for us for more than two years, was instrumental in developing creative campaigns for our key client, Pepsi, and was the account manager for Bacardi, another one of our most important clients. Since he was such an important part of our team, we asked him to reconsider and offered him a six month extension on his employment agreement. Alternatively, we reminded him that if he left, he would be bound by the non-solicitation and non-competition provisions set forth in his employment agreement (see Employment Agreement, dated February 3, 2005, between The Management Group, LLC and Nick McCabe (the "Employment Agreement") (Exh. C).

23.    In particular, paragraph 10 of the Employment Agreement provided:

> You shall keep secret all confidential matters of Company, and
> shall not disclose them to anyone outside of Company, either
> during or after your employment with Company, except disclosure
> of confidential matters will be permitted: (i) to Company, its
> affiliates and their respective advisors; (ii) if such confidential

matters have previously become available to the public without
your assistance or involvement; (iii) if required by any court or
governmental agency or body or as otherwise required by law; (iv)
if necessary to establish or assert your rights hereunder or under
Company's Operating Agreement; or (v) if expressly consented to
by Company.  You shall deliver promptly to Company upon
termination of your employment, or at any time Company may
request, all confidential memoranda, notes, records, reports and
other documents (and all copies thereof) relating to the business of
Company which you may then possess or have under your control.
(Exh. C, ¶ 10)

24.    Paragraph 5(b) of McCabe's Employment Agreement provided:

During the Non-Solicitation Period (defined below), neither you
nor any Related Person (defined below) shall knowingly, either
directly or indirectly, for himself or for any other person or entity,
(i) call upon, solicit or take away, or attempt to call upon, solicit or
take away, any person then employed by Company or (ii)
knowingly employ any employee of Company who voluntarily
terminates such employment until twelve (12) months have passed
following termination of such employment, unless such condition
is waived by Company in writing. "Non-Solicitation Period" shall
mean the period from the date hereof until twelve (12) months
after the termination of your employment with Company. "Related
Person" shall mean any person or entity who or which, directly or
indirectly, is controlled by or otherwise affiliated with you or any
person who is a member of your family.  (Exh. C, ¶ 5(b))

25.    Paragraph 5(c) of McCabe's Employment Agreement provided:

During the term of your employment with Company and for the
twelve (12) months following termination of such employment,
neither you nor any Related Person shall knowingly, either directly
or indirectly, for himself or for any other person or entity, enter
into any agreement, or assist any other person or entity in entering
into any agreement or other arrangement regarding any projects or
clients introduced to Company or acquired or developed by
Company or you prior to or during the term of your employment
by Company.  (Exh. C, ¶ 5(c))

26.    Shortly after we reminded McCabe of these provisions, he retained the same attorney

who had represented Moffitt.  After several weeks of negotiations, we agreed to modify McCabe's

employment agreement to allow him to continue working with Bacardi.  We based this very hard

decision solely upon McCabe's representation that if we allowed him to continue working with Bacardi as a liaison and salesperson, he would insure that we continued handling the coordination and production for Bacardi's events. In short, we elected to let him work so we could protect this account. Indeed, he repeatedly assured us that since we already had a highly successful track record producing profitable shows for Bacardi, he would not change a winning formula. In addition, he stated that he did not have the necessary experience or background to handle production for these type of high profile events by himself.

27.    Since our relationship with Bacardi was extremely lucrative, we did not want to do anything to jeopardize it. In March 2007, we had produced a highly successful show for Bacardi in Miami and earned a production fee of $122,000. We were awaiting execution of an agreement with Bacardi to produce its October 2007 show in New York where we were projecting a profit of over $300,000. In addition, we had already begun working on site inspections and creating a budget for Bacardi's scheduled November 2007 Los Angeles show and were also anticipating producing the March 2008 Miami show. Indeed, we projected earning more than $500,000 in fees for both of these shows. Accordingly, we entered into a modified employment agreement with McCabe which specifically exempted Bacardi from the non-solicitation and unfair competition provisions of the original agreement (see letter, dated as of June 20, 2007, between The Management Group, LLC and Nick McCabe (the "Modification Agreement")) (Exh. D). Significantly, except as expressly provided in the Modification Agreement, all other terms and conditions of the Employment Agreement, including the confidentiality, non-solicitation and unfair competition provisions, were expressly ratified and confirmed and remained in full force and effect.

28.    Unfortunately, we were grossly misled. Two days after we signed the modified agreement with McCabe, our lead designer, defendant Jessie Angles, who worked with McCabe in Miami, abruptly quit without explanation except to say that he wanted to be a consultant. On

August 8, 2007, McCabe e-mailed us to say that Bacardi had advised him that since its budget for the Los Angeles event was much tighter than for previous events, it could not "accommodate" fees for both him and us (Exh. E). In addition, McCabe stated that he would be "consulting and coordinating" the overall show and Bacardi would use a "smaller local vendor at a much lower fee" to handle production (id.).

29.    Thereafter, however, we learned that Moffitt's partner, Peter Haywood, the Managing Director of AMG, had flown in from the UK and been hired as a "consultant" to oversee the November 2007 Los Angeles event and that AMG would be producing the entire March 2008 Miami event. In addition, we discovered that both McCabe and Angles were now employed by AMG. In short, Moffitt had solicited McCabe and Angles and thereafter fraudulently conspired with them to steal Bacardi from us.

30.    When we confronted Moffitt about this egregious betrayal, he was extremely arrogant and unapologetic. He stated that he was extremely "bitter" towards our company and me, in particular; that we would regret ever "crossing swords" with him; and that he intended to "destroy" us and all of our affiliated properties. Significantly, both Moffitt and his co-conspirators, McCabe, Angles, Dhami, Piaggi and Vidal, had access to our most confidential and proprietary information and trade secrets including, but not limited to, our business models and plans, our corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences. Armed with this and using highly proprietary and confidential information, Defendants are intent upon destroying our business piece-by-piece.

31.    First, knowing full well that we had actively sought to acquire NapkinNights.com, a nightlife website which directly competes with our own website, Clubplanet.com, Moffitt did an end run around us and instead secured an interest in the website for AMG. In addition, Moffitt entered into a joint venture with Trinity St., a ticketing company which Moffitt knew we were also

seeking to do a joint venture with and which competes directly with our own proprietary ticketing vehicle, Wantickets.com. Indeed, Moffitt solicited and stole our sales representative for Wantickets.com, defendant Anu Dhami, so that she could instead work directly for Trinity St. and NapkinNights (Exh. F). Significantly, Dhami is now using TMG's confidential information to wrongfully solicit our customers. In total, Moffitt wrongfully solicited seven (7), and eventually stole five (5), of our employees in violation of the confidentiality and non-solicitation provisions of the Termination Agreement.

32.    Thus, in or about December 2007, Moffitt solicited and stole defendants Piaggi and Vidal, TMG's regional sales manager and national photo editor, respectively, both of whom had access to highly confidential information concerning our customers and pricing for our proprietary website, CoolJunkie.com. Thereafter, Piaggi and Vidal went to work for Angel and are now using TMG's confidential information to wrongfully solicit our customers.

33.    In addition, Defendants engaged in numerous other acts of unfair competition by undercutting our prices and soliciting and/or stealing our customers and employees. Indeed, AMG's conspiracy to exploit and misappropriate our confidential information and steal our business was so brazen that it submitted the following entry to Wikipedia, the free online encyclopedia:

> In June of 2006, AMG merged with the United States company Track Entertainment, after partnering with them on the successful US version of the Global Gathering festival in March of 2006. The merger gave them a solid footprint in all the major markets in the United States. The joint venture was short-lived and AMG now competes directly with Track through new joint ventures with the photo community web site Napkin Nights, event producers Live Nation, and the interactive services company Trinity Street. (Exh. G) (emphasis added)

34.    As if this heinous business piracy were not enough, Moffitt has also threatened my life; slandered and disparaged Mr. Heiman and myself to our business associates; and taunted us with e-mails in which he reiterated his intention of destroying our business.

## ARGUMENT

## A TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION SHOULD BE GRANTED

35.    I am advised by my attorneys that a temporary restraining order and a preliminary injunction should be granted where the moving party establishes a likelihood of success on the merits; irreparable injury absent the granting of a preliminary injunction; and a balance of the equities in the movant's favor. Here, each of these elements have been met.

36.    Indeed, I am advised by my attorneys that courts have issued preliminary injunctions against former employees even without a restrictive covenant where they have breached trust or stolen the employer's proprietary information. As set forth in the accompanying memorandum of law, while courts have held that the disloyalty of employees might ultimately give rise to an award of damages, the misappropriation of confidential business information and goodwill is not something that can be adequately remedied at law. Under such circumstances, courts have uniformly recognized the need for an injunction (see Memorandum of Law at 4-5).

37.    Here, Defendants have not only betrayed our trust and the confidential nature of our employment relationship but have also breached the explicit confidentiality and non-solicitation provisions set forth in the Termination Agreement (see Exh. B, ¶ 11) (parties agree to keep Confidential Information confidential at all times and not to make use of such information on their own behalf or on behalf of any third party). Without immediate injunctive relief, we will suffer irreparable injury because our business and valuable goodwill will be destroyed forever. Thereafter,

00370652.2                                              -13-

any award of damages we receive will constitute nothing more than a pyrrhic victory. In addition, the balance of equities are clearly in our favor because defendants have shamelessly pursued a course of conduct designed to maliciously injure and destroy our business.

38.    Finally, in view of Moffitt's threats of physical violence and campaign of harassment and slander against us, an order of protection should be entered directing him and/or his representatives to (i) stay away from Mr. Heiman and myself and our respective family members, including, but not limited to, our homes and places of business; (ii) refrain from communicating with Mr. Heiman and myself and our respective family members, by any means whatsoever (other than through legal counsel) including, but not limited to, mail, facsimile, e-mail, telephone or voice-mail; (iii) refrain from assaulting, stalking, harassing, menacing, recklessly endangering, intimidating, threatening or annoying Mr. Heiman and myself and our respective family members; and (iv) refrain from making any statements, whether written or oral, public or private, that disparage, denigrate or defame Mr. Heiman and myself and our respective family members, friends and associates.

39.    We have no adequate remedy at law and there has been no previous application made to this or any other Court for the relief requested herein.

## CONCLUSION

40.    As is evident, we are in need of and deserve the immediate equitable intercession of this Court. The defendants' heinous conduct should be immediately enjoined and the order of protection granted.

WHEREFORE, I respectfully request that the motion be granted in its entirety.

_____
ANDREW FOX

Sworn to before me this
26th day of February, 2008

Notary Public
MARGARET L. CONNAUGHTON
NOTARY PUBLIC
STATE OF NEW YORK
NO. 01CO4972568
QUALIFIED IN WESTCHESTER COUNTY
COMMISSION EXPIRES OCTOBER 21, 20 10

EXHIBIT A

## AGREEMENT

AGREEMENT is made as of May 19, 2006 (the "Effective Date"), by and between THE MANAGEMENT GROUP, LLC, a New York limited liability company, with offices located at 485 Madison Avenue, New York, New York 10022 ("Buyer"), Neil Moffitt, an individual with an address at 2640 Mirabella Street, Nevada, USA ("Moffitt"), Peter Haywood, an individual with an address at 62 Street Lane, Roundhay, Leeds, LS8 2AA ("Haywood") and James Algate, an individual with an address at 84 Wetherby Way, Stratford Upon Avon, CV37 9LU ("Algate") (Moffitt, Haywood and Algate are collectively referred to herein as "Sellers").

## WITNESSETH:

WHEREAS, Sellers wish to sell all of their shares of Angel Music Group, Ltd. (the "Shares") to Buyer; and

WHEREAS, Buyer desires to purchase all of the Shares on the terms and subject to the conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the premises and of the respective representations, warranties, covenants, agreements and conditions contained herein, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall, for the purposes of this Agreement, have the following meanings (terms defined in the singular or the plural include the plural or the singular, as the case may be):

1.1     "Shares" shall mean all of Sellers' shares of Angel Music Group, Ltd. ("AMG")

1.2     "Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, controls, is under common control with, or is controlled by, that Person. For purposes of this definition, "control" (including, with its correlative meanings the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

1.3     "Closing" shall mean the closing of the transactions contemplated by this Agreement.

1.4     "Code" shall mean the U.S. Internal Revenue Code of 1986, as amended, and all regulations promulgated thereunder.

1.5     "Encumbrance" shall mean, excluding Permitted Encumbrances, any mortgage, pledge, security interest, lien, restriction on use or transfer, voting agreement, adverse claim or encumbrance or charge of any kind (including any agreement to give

1

any of the foregoing), any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of, or any agreement to give, any financing statement under the Uniform Commercial Code or similar law of any jurisdiction.

1.6    "Governmental Body" shall mean any domestic or foreign national, state or municipal or other local government or multinational body, any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body exercising any regulatory authority thereunder and any corporation, partnership or other entity directly or indirectly owned by or subject to the control of any of the foregoing.

1.7    "Permitted Encumbrances" shall mean (i) mechanics', materialmen's or similar inchoate liens relating to liabilities not yet due and payable, (ii) liens for current taxes not yet delinquent, to the extent the validity thereof is being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing foreclosure or enforcement of such liens and where adequate reserves are established and maintained in accordance with GAAP, and (iii) Encumbrances incurred in connection with the purchase or lease of furniture, fixtures or equipment in the ordinary course of the Business.

1.8    "Person" shall mean an individual, sole proprietorship, corporation, partnership, joint venture, unincorporated organization, estate, union, employee organization, or other entity.

1.9    "Purchase Price" shall mean the consideration described in Section 2.2 below.

1.10    "Term Sheet" shall mean the term sheet dated among Buyer and Sellers, a copy of which is attached hereto as Schedule 1.10.

## ARTICLE II

## PURCHASE AND SALE OF THE SHARES

2.1    Purchase and Sale of the Shares.    On the terms and subject to the conditions set forth in this Agreement, the Sellers agree to sell, assign, transfer and deliver (collectively, "Transfer") the Shares to Buyer as of the date hereof (the "Closing Date"), free and clear of all Encumbrances. Said transfer is intended to be a tax-free exchange under the Code, and Buyer agrees to take any further actions necessary to confirm and effect such tax treatment.

2.2    Payments for the Shares to be Made at Closing.    In consideration for the Shares, Buyer agrees to the following:

(a)    (i)    Buyer agrees to issue to Moffitt Class A Membership Interests of Buyer, so that after the transaction he owns 23.75% of the outstanding equity of Buyer.

(ii)    Buyer also agrees that Moffitt will receive a cash payment, payable upon the transfer of control of Buyer or the sale of substantially all of the assets of Buyer. The cash payment shall be equal to 7.5% of the gross compensation paid by a buyer for the controlling equity of Buyer or substantially all of the assets of Buyer, as

2

applicable, less only the expenses associated with the negotiation of the applicable transaction. For purposes of this subparagraph 2.2(a), a transfer of control (A) shall mean a transaction pursuant to which the then current members of Buyer sell, in the aggregate, more than 60% of the total outstanding membership interests of Buyer and (B) shall not mean the issuance of new membership interests by Buyer in connection with a transaction the primary purpose of which is to provide financing for the operations of Buyer. Moffitt agrees that he shall have the right to only one payment under this subparagraph 2.2(a).

(iii)    As Buyer intends to issue membership interests to third parties after the date hereof in connection with Buyer's efforts to raise financing, purchase additional businesses for Buyer and other purposes, and as such issuance will dilute the membership interests of all of the members of Buyer (including Moffitt's membership interests), Moffitt agrees that if such dilution occurs after the date hereof, Moffitt's applicable cash payment percentage payable pursuant to this subparagraph 2.2(a) shall be deemed reduced by the same percentage as his membership interests have been diluted in each instance, effective as of the date of such dilution.

(b)    (i)    Haywood and Algate will each receive Class B Membership Interests, so that after the transaction they each own 5.08% of the outstanding equity of Buyer. The issuance of such Class B Membership Interests shall be subject to Haywood's and Algate's individual right to sell back to Buyer 70.47% of such Membership Interests by exercising either of the following options:

(A)    Option 1: If Buyer receives financing of at least $7,000,000 prior to December 1, 2006, then, during the 45 day period following Buyer's receipt of such funds, Haywood and Algate shall each have the option to require Buyer to repurchase the full 70.47% of their then-outstanding Membership Interests for a purchase price of $1,500,000 or 860,743.12 British Pounds Sterling. This option must be exercised in writing delivered to Buyer within 45 days following Buyer's receipt of such funds, and Buyer agrees to notify Haywood and Algate of such receipt no later than the business day following said receipt. Buyer shall be required to close such repurchase no later than 30 days following receipt of such written notice from Haywood or Algate.

(B)    Option 2: To the extent Haywood or Algate has not exercised the option described in clause 2.2(b)(i)(A) above, then, commencing December 2, 2006, they shall have the option to sell 70.48% of their membership Interests back to Buyer. This option must be exercised in writing delivered to Buyer during any working day of December 2006 and, if unexercised, will expire on December 31, 2006. If the option detailed in this clause 2.2(b)(i)(B) is exercised, Buyer shall be required to close the repurchase of said membership interests as follows:

(1)    46.98% of their membership interests must be purchased by Buyer on or before January 31, 2007, at a purchase price equal to the higher of $1,000,000 (US) or £573,828.82 (British Pounds Sterling).

(2)    11.75 % of their membership interests must be purchased by Buyer on or before June 30, 2007, at a purchase price equal to the higher of $250,000 (US) or £143,457.20 (British Pounds Sterling).

(3)    11.75% must be purchased by Buyer on or before December 31, 2007 at a purchase price equal to the higher of $250,000 (US) or £143,457.20 (British Pounds Sterling).

(ii)    Buyer agrees that if Haywood or Algate selects the U.S. Dollar amount identified in to clauses 2.2(b)(i)(A) or 2.2(b)(i)(B)(1), (2) or (3), they shall nonetheless have the right to require Buyer to pay such Dollars amount in British Pounds Sterling, calculated at the effective exchange rate on the date of payment.

(iii)    Buyer agrees that the repurchased Membership Interests will be retired, effectively increasing the outstanding membership interest percentages of all of the members of Buyer (including Haywood and Algate).

ARTICLE III

CLOSING

3.1    Time, Place of Closing.    The Closing shall take place on the Closing Date at such place and time as is mutually agreed upon by Buyer and Sellers.

3.2    Sellers' Documents Delivered at Closing.   At the Closing, Sellers shall deliver to Buyer the following:

(a)    Certificates representing Sellers' ownership of the Shares, or written confirmation from AMG, satisfactory to Buyer, that no such certificates were issued to Sellers, but that Sellers own all of the issued and outstanding shares of AMG; and

(b)    Such other instruments of transfer, in form and substance satisfactory to Buyer, as Buyer shall request to vest effectively in Buyer title to the Shares.

3.3    Buyer Documents Delivered at Closing.    At the Closing, Buyer shall deliver to Sellers membership certificates representing the Membership Interests being issued by Buyer to Moffitt, Haywood and Algate pursuant to subparagraph 2.2

3.4    Other Deliveries at Closing.

(a)    Fully executed employment agreements between Buyer and each of Moffitt, Haywood and Algate in the form annexed hereto as Exhibit 3.4.

(b)    Operating Agreement of Buyer, executed by Sellers and all of the other members of Buyer.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties of Sellers.  Sellers, jointly and severally, represent and warrant to Buyer that:

4

(a)    AMG is a corporation duly organized, validly existing and in good standing under the laws of the England. Except as disclosed to Buyer, AMG has full power and authority to own and lease the properties and assets it now owns and leases and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted. AMG is in good standing, current in the filing of all governmental reports and duly qualified to conduct its business as a foreign entity in each of the jurisdictions in which the ownership or leasing of its properties or assets or the conduct of its business and requires such qualification.

(b)    Sellers have the requisite power and authority to enter into this Agreement and to perform their respective obligations hereunder. Sellers have complete and unrestricted authority and power to sell, convey, assign and deliver to Buyer good and marketable title to the Shares, free and clear of all Encumbrances. This Agreement is a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms. To the knowledge of Sellers, no other act, approval or proceedings on the part of either Sellers or any other Person is, or will be, required to authorize the execution and delivery of this Agreement by either of them or the consummation of the transactions contemplated by this Agreement. Sellers are the sole equity owners of AMG.

(c)    This Agreement and the execution and delivery of this Agreement by Sellers does not, and the fulfillment and compliance with the terms and conditions of this Agreement and the consummation of the transactions contemplated hereby will not (i) conflict with, result in a breach of, constitute a default under, or require the consent of any person under, any of the terms, conditions or provisions of any agreement among Sellers, (ii) violate any provision of, or require any consent, authorization or approval under, any law or administrative regulation or any judicial, administrative or arbitration order, award, judgment, writ, injunction or decree applicable to Sellers or AMG, (iii) conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), or accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under, the termination of, or the right to terminate, any indenture, mortgage, lease, license, franchise, permit, approval, agreement or instrument to which AMG, Sellers or any of the Shares are bound, or (iv) result in the creation or imposition of any Encumbrance upon their respective assets or the assets of AMG or cause their respective assets of the assets of AMG to become subject to any order, judgment, decree or award of any court or other judicial, administrative or regulatory body or arbitrator or party to any proceeding before any of the foregoing having prospective effect on the Shares or the business of Sellers.

(d)    (i)    With respect to periods through December 31, 2005, and at all times thereafter, Sellers and AMG have duly filed all required tax returns and reports of any nature or description (including returns or reports with respect to taxes withheld from or imposed in respect of employee wages) with, and has paid all taxes of any nature or description (including taxes imposed upon employees and collected by Sellers and/or AMG) due to, all appropriate taxing authorities, including, but not limited to, federal, state, and local income tax returns, which include income as well as all franchise, profits, sales, transfer, use, property, occupancy and excise tax returns required of Sellers and AMG to be filed and/or paid through the date hereof, Sellers and AMG have paid or accrued in full all additions to taxes, penalties, fines, interest and related charges and fees to the extent such filings and payments are required for all

5

periods ended prior to and including the date hereof, or that any taxes outstanding from Sellers or AMG will not have a material adverse effect on the business operations of AMG. All information provided in such returns is true, complete and accurate.

(ii)    Neither Sellers nor AMG have any deficiency for any period or any liability with respect to any taxes, penalties, interests or related charges, regardless whether assessed. There are no claims, assessments, prosecutions or similar actions pending against Sellers or AMG and neither Sellers nor AMG have received a written notice indicating that any such actions have been threatened.

(e)    (i)    One hundred percent of all issued and outstanding shares of capital stock of AMG are owned, of record and beneficially, by Sellers, free and clear of all Encumbrances, (ii) all of the outstanding equity securities of AMG have been duly authorized and validly issued and are fully paid and non-assessable, (iii) no shares of capital stock of AMG are reserved for issuance and there are no outstanding rights to purchase or otherwise receive from AMG any of the authorized but unissued shares of the capital stock or any other security of AMG, (iv) there are no outstanding convertible securities issued by AMG, (v) there are no outstanding convertible securities issued by AMG convertible into capital stock of AMG, and (vi) there are no subsidiaries or affiliates of AMG (other than Sellers).

(f)    The financial information provided by Sellers and AMG to Buyer about AMG (including, without limitation, the lists of receivables and payables) fairly presents the financial condition and the results of operations and cash flow of AMG, subject to normal recurring year-end adjustments.

(g)    Since the creation of AMG, AMG has been the sole entity through which the Sellers have conducted all of their business operations. No other entity owned or controlled, directly or indirectly, by Sellers has been involved in AMG's business operations.

(h)    None of Sellers and AMG are party to any litigation and none are aware of any material threatened or pending litigation claims.

(i)    No representation or warranty contained in this Agreement or in any Schedule, or other instrument furnished or to be furnished by Sellers to Buyer pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact which is necessary in order to make the statements contained herein or therein not false or misleading. All documents delivered or to be delivered by Sellers in connection with the transactions contemplated by this Agreement are or will be true and complete copies of what they purport to be.

4.2    Representations and Warranties of Buyer.  Buyer represents and warrants to Sellers that:

(a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York. Buyer has full legal power and authority to own and lease the properties and assets it now owns and leases and to carry on its business as and where such properties and assets are now owned or leased and such business is now conducted.

6

(b)      Buyer has the legal power and authority to enter into this Agreement and to perform its obligations hereunder. This Agreement is a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. No other act, approval or proceeding on the part of Buyer is or will be required to authorize the execution and delivery of this Agreement by Buyer or the consummation of the transactions contemplated by this Agreement.

(c)      This Agreement and the execution and delivery hereof by Buyer does not, and the fulfillment and compliance with the terms and conditions of this Agreement and the consummation of the transactions contemplated hereby will not, (i) conflict with any of, or require the consent of any Person under, the terms, conditions or provisions of the Certificate of Formation or other corporate documents of Buyer, (ii) conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), or accelerate or permit the acceleration of the performance required by, or require any consent, authorization or approval under, any indenture, mortgage, lease, agreement or instrument to which Buyer is a party or by which it is bound or to which any of its assets or property is subject, or (iii) result in the creation of any Encumbrance upon the assets or property of Buyer (except as expressly provided herein). Buyer is not subject to any order, judgment, decree or award of any court or other judicial, administrative or regulatory body or arbitrator having prospective effect.

(d)      (i)      With respect to periods through December 31, 2005, and at all times thereafter, Buyer has duly filed all required tax returns and reports of any nature or description (including returns or reports with respect to taxes withheld from or imposed in respect of employee wages) with, and has paid all taxes of any nature or description (including taxes imposed upon employees and collected by Buyer) due to, all appropriate taxing authorities, including, but not limited to, federal, state, and local income tax returns, which include income as well as all franchise, profits, sales, transfer, use, property, occupancy and excise tax returns required of Buyer to be filed and/or paid through the date hereof, Buyer have paid or accrued in full all additions to taxes, penalties, fines, interest and related charges and fees to the extent such filings and payments are required for all periods ended prior to and including the date hereof, or that any taxes outstanding from Buyer will not have a material adverse effect on the business operations of Buyer. All information provided in such returns is true, complete and accurate.

(ii)      Buyer has no deficiency for any period or any liability with respect to any taxes, penalties, interests or related charges, regardless whether assessed. There are no claims, assessments, prosecutions or similar actions pending against Buyer and Buyer has not received a written notice indicating that any such actions have been threatened.

(e)      The financial information provided by Buyer to Sellers about Buyer (including, without limitation, the lists of receivables and payables) fairly presents the financial condition and the results of operations and cash flow of Buyer, subject to normal recurring year-end adjustments.

(f)      Buyer is not a party to any litigation and is unaware of any material threatened or pending litigation claims.

(g)    No representation or warranty by Buyer contained in this Agreement, or in any or other instrument furnished or to be furnished by Buyer pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact which is necessary in order to make the statements contained herein or therein not false or misleading. All documents delivered or to be delivered by Buyer to Sellers pursuant to this Agreement are or will be true and complete copies of what they purport to be.

## ARTICLE V

## FURTHER AGREEMENTS

5.1    Sales Taxes. Sellers shall pay any sales taxes payable in connection with the sale of the Shares contemplated by this Agreement.

## ARTICLE VI

## NATURE AND SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

6.1    Nature and Survival of Representations, Warranties and Covenants. All representations, warranties and covenants made by Sellers or Buyer in this Agreement delivered in connection with the transactions contemplated hereby shall survive the Closing and any investigation at any time made or any knowledge received by or on behalf of Sellers or Buyer.

6.2    Indemnification.    Buyer and Sellers shall each indemnify, save and hold harmless the other and its successors, assigns, affiliates, agents and contractors, and their partners, officers, directors, and employees, from and against any damage, loss, claim, judgment or other liability or expense (including but not limited to reasonable attorneys' fees (including attorneys' fees incurred by a party to this Agreement in connection with a dispute hereunder)) which may in any way arise out of any breach of any representation, warranty, agreement or covenant set forth in this Agreement or any act or omission arising in connection with this Agreement; provided such claim has been adjudicated or settled with the indemnifying party's consent, which consent shall not be unreasonably withheld. The indemnifying party acknowledges and agrees that the indemnified party reserves the right, without being required to do so, and without waiver of any indemnity hereunder, to defend any claim, action or lawsuit coming within the scope of this indemnity provision. The party to be indemnified shall promptly notify the indemnifying party of any such claim and indemnifying party shall have the right to participate in the defense thereof with counsel of its choice at its expense. This paragraph shall survive the termination or expiration of this Agreement.

## ARTICLE VII

## MISCELLANEOUS

7.1    Governing Law; Jurisdiction. This Agreement shall be governed by and be construed in accordance with the law of the State of New York, without regard however to the conflicts of laws principles thereof. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, or otherwise relating to, this Agreement shall be brought against Sellers or Buyer in the Federal or state courts

8

located in the County of New York, State of New York. Notwithstanding the foregoing, the parties acknowledge that the transfer of the Shares shall be subject to the laws of England and Wales governing corporations and disputes regarding whether the transfer of the Shares was properly accomplished will be governed by such laws.

7.2    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed duly given and delivered when delivered by messenger (including FedEx, DHL) or mailed by registered or certified mail, postage prepaid, return receipt requested, or transmitted by facsimile (with a "hard" copy sent concurrently by registered or certified mail, postage pre-paid), to the parties at the following addresses (or at such other address for a party as such party shall from time to time specify by like notice):

If to Buyer:

The Management Group, LLC
485 Madison Avenue
New York, NY 10022
Attn:   Mr. Andrew Fox, CEO

If to Sellers:

Neil Moffitt
2640 Mirabella Street,
Nevada,
USA

Peter Haywood
62 Street Lane,
Roundhay,
Leeds,
LS8 2AA

James Algate
84 Wetherby Way,
Stratford upon Avon,
CV37 9LU

7.3.    Additional Acts.    The parties shall not take any action to frustrate the intent or operation of this Agreement or the terms and provisions hereof and each party shall act with the utmost good faith in its dealings in connection with the matters contemplated by this Agreement and its dealings with the other parties hereto

7.4    Entire Agreement; Waiver, Modifications.    This Agreement constitutes the complete and exclusive agreement among the parties with respect to the subject matter hereof and supersedes all prior discussions and understandings, whether written or oral, express or implied. No modification, discharge or waiver, in whole or in part, of any of the provisions hereof shall be valid unless in writing and signed by the party against whom the same is sought to be enforced. A failure or omission of any party hereto to insist, in any instance, upon strict performance by the other party of any term or provision of this Agreement or to exercise any of its rights hereunder shall not be

9

deemed a modification of any term or provision hereof, or a waiver or relinquishment of the future performance of any such term or provision by such party, nor shall such failure or omission constitute a waiver of the right of such party to insist upon future performance by the other party of any such term or provision or any other term or provision of this Agreement.

7.5     Headings; Interpretations.     The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

7.6     No Assignment.     This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors, assigns, heirs and personal representatives. This Agreement may be assigned by Sellers only with Buyer's prior written consent. This Agreement may be assigned by Buyer to any Affiliate or to any Person acquiring substantially all of Buyer's US operations.

7.7     Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

7.8     Brokers.     The parties represent and warrant to each other that there are no brokers representing either party to this transaction.

7.9     Severability.     In the event that any provision of this Agreement is declared by a court of competent jurisdiction to be void or unenforceable, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect to the extent feasible in the absence of the void and unenforceable provision. The parties furthermore agree to execute and deliver such amendatory contractual provisions to accomplish lawfully as nearly as possible the goals and purposes of the provision so held to be void or unenforceable.

IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Agreement to be duly executed as of the date written on the first page of this Agreement.

THE MANAGEMENT GROUP, LLC

By: _____
Andrew Fitt, CEO and Manager

_____
Neil Moffitt

_____
Peter Haywood

_____
James Algate

10

EXHIBIT B

This Agreement (the "Agreement"), dated as of March 1, 2007 by and among The Management Group, LLC (the "Company"), Angel Music Group Ltd. ("AMG"), Neil Moffitt ("Moffitt"), Peter Haywood ("Haywood") and James Algate ("Algate") (Moffitt, Haywood and Algate are collectively referred to herein as "Sellers"), terminates the Purchase Agreement dated May 19, 2006, among the Company, Haywood, Algate and Moffitt (the "Purchase Agreement") and memorializes certain future arrangements made by the parties in connection therewith.

WHEREAS, notwithstanding the terms of the Purchase Agreement, the parties did not close or otherwise consummate the transactions contemplated by the Purchase Agreement;

WHEREAS, the parties have concluded that the consummation of the transactions contemplated by the Purchase Agreement would no longer be in the best interests of their respective businesses; and

WHEREAS, the parties desire to terminate the Purchase Agreement and to confirm their on-going obligations regarding certain matters that arose in connection with transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual premises herein contained, the parties to the Amendment agree as follows:

1.    Termination.    The term of the Purchase Agreement hereby is terminated, effective as of the date of this Agreement.

2.    Las Vegas Office.

(a)    (i)    AMG acknowledges that the Company has entered into an office lease agreement (the "Las Vegas Lease") with 3773 HHP LLC (the "Landlord") for office space located at Suite 110N, 3773 Howard Hughes Parkway, Las Vegas, Nevada 89109 (the "Las Vegas Office"). The lease is is annexed in Schedule 1. AMG and the Company agree to use their best efforts to secure the Landlord's consent to an assignment of the Las Vegas Lease from the Company to AMG (or an entity designated by AMG).

(ii)    Commencing as of March 1, 2007 and continuing until such assignment is effective or the Las Vegas Lease is terminated by the Landlord, the Company agrees that AMG will be permitted to use the Las Vegas Office for AMG's business, and in consideration of such agreement, AMG agrees to assume and be responsible for all of the Company's obligations under the Las Vegas Lease including, without limitation, all of the Company's obligations to make payments under and to comply with the terms of the Las Vegas Lease, a copy of which is annexed in Schedule 1.

(iii)    AMG agrees to pay the Company an amount equal to the security deposit for the Las Vegas Lease within thirty (30) days following the execution of this Agreement provided that the Company has assigned the lease to AMG. Should the Company not be able to assign the lease then the security deposit will remain an asset of the Company and the company will receive the deposit back under the terms of the Lease.

(b)    AMG will also assume all obligations for other office expenses at the Las Vegas office including, without limitation, storage, phones, office equipment, parking and Direct TV, effective as of March 1, 2007. Promptly following the execution of this Agreement,

AMG and the Company agree to use their best efforts to have all arrangements for office equipment and services assigned from the Company to AMG, and until such assignment has occurred, the Company shall permit AMG to use all such office equipment, so long as AMG makes timely payment to third parties for office expenses incurred.

      (c)     (i)     AMG agrees that, effective as of March 1, 2007, AMG shall be the employer of all of the Company's employees located at the Las Vegas Office as detailed in Schedule 2, except that Amber Pruett will continue to be employed by the Company. AMG agrees that Ms. Pruett will be permitted to use the Las Vegas Office as she has prior to the date of this Agreement until August 31, 2007, at no rental cost to the Company, although the Company will reimburse AMG for any out of pocket expenses incurred by Ms. Pruett (i.e., long distance phone, FedEx, postage), payment to be made within 30 days following the Company's receipt of AMG's invoice. Thereafter, AMG agrees to negotiate in good faith an extension of such arrangement, if requested by the Company.

      (ii)     Promptly following the execution of this Agreement, the Company will work with AMG to insure a smooth transition of employees from the Company to AMG. AMG acknowledges that as part of AMG's assumption of responsibilities to employees, AMG is assuming the Company's obligation to pay Sol Shafer $26,000 (U.S.) per annum, it being acknowledged that Mr. Shafer will be working for the Canadian joint venture described in Paragraph 5 below. AMG will continue to pay Mr. Shafer annual compensation of $26,000 (US) and to permit Mr. Shafer to work out of the Company's Los Angeles office at no cost to AMG or Mr. Shafer.

      (ii)     Although the health coverage for the Las Vegas employees under the Company's group health plan will terminate as of March 1, 2007, following that date all employees (inclusive of Neil Moffitt) will be provided an opportunity to continue health coverage for themselves and qualifying dependents under the Company's group health plan in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), which currently provides such employees a right to continue such coverage for a period of eighteen (18) months, subject to certain conditions.

3.     Legal Expenses.

      (a)     AMG and the Company have shared certain legal expenses arising in connection with the trademark infringement case (the "Global Gathering Litigation") that is on-going in Florida as a result of their co-promotion of the Global Gathering event held in Miami in March 2006 and prior to entering into the Purchase Agreement. There currently remains outstanding fees and expenses due to two law firms as follows: 1) Notaro & Michalos are owed a balance for all work up to the date of this Agreement of $209,069.04 and 2) John Rosenberg's firm are owed a balance for all work up to the date of this Agreement of $78,410. The Company agrees to take responsibility for the payment of all outstanding legal costs that have been incurred in this case up to the date of this Agreement save for 50% of the balance of the fees owed to John Rosenberg's firm. Therefore the Company agrees to take responsibility for the full amount of the balance

due to Notaro and Michalos. The Company agrees to take responsibility to pay John Rosenberg's firm $39,205 and AMG agrees to take responsibility to pay John Rosenberg's firm $39,205. AMG agrees that all legal expenses (being costs incurred by legal companies in relation to the Global Gathering Litigation) incurred in connection with the Global Gathering Litigation after the date of this Agreement are the responsibility of AMG. AMG

(b)        further agrees to use its best efforts to cooperate in the Company's efforts to extricate itself from the Global Gathering Litigation, it being understood by the Company that AMG cannot in anyway ensure that this happens.

(b)        AMG, the Sellers and the Company agree that with respect to all other litigation involving their respective activities, each will be responsible for their own legal expenses, and that each will use their respective best efforts to cooperate in any effort made by the other to extricate themselves from involvement in litigation, to the extent such involvement arose by virtue of the Purchase Agreement and activities that occurred during the period following the execution of the Purchase Agreement and the date hereof.

4.        Trademarks; Other Rights.

(a)        The Company, AMG and the Sellers acknowledge that in contemplation of the consummation of the Purchase Agreement, they have jointly or individually used the names "Live2Net", "L2N" or variations thereof (the "Marks"), in connection with their business activities.  AMG and the Sellers hereby assign all rights that it may have in the Marks to the Company and waives all rights, claims or interests it may have in the Marks.

(b)        The Company, AMG and the Sellers further acknowledge and agree that, except as expressly provided otherwise in this Agreement, neither has acquired any rights in copyrights, trademarks, service marks, other intellectual property or any other assets owned, created or otherwise acquired by the other prior to or after the execution of the Purchase Agreement, regardless of the actions taken by them (either jointly or separately) during the period following the execution of the Purchase Agreement.

5.        Joint Venture.  The Company and AMG agree that within 60 days following the execution of this Agreement, the parties will negotiate in good faith using reasonable efforts a joint venture arrangement (the "Joint Venture") for the operation of their joint activities that are to take place in Canada, it being agreed that it is intended that such arrangement will incorporate the ideas and terms which are to be negotiated and detailed further in a Joint Venture Agreement (JVA), that JVA being the only document by which the Joint Venture will be run and that details the actual obligations and commitments of the Company and AMG.

(a)        It is intended that the Joint Venture will be a corporate entity that will be owned in equal shares by the Company and AMG. The Joint Venture will be the entity through which Stephane McGarry and Sol Shafer (currently the Company's employees) will provide their respective services to AMG and the Company. AMG and the Company agree to negotiate in good faith a new arrangement pursuant to which AMG will share equally the expenses associated with such employees and transfer the applicable arrangements currently in place between the

3

Company and such Messrs. McGarry and Shafer, including the payment of twelve and one-half percent (12.5%) of the net profits of the Canadian operations of the Joint Venture to each of them.

(b)     The Joint Venture will acknowledge that the Company has spent start-up expenses (e.g., office, salaries, etc.; currently $32,000), all of which must be reimbursed to the Company prior to any division of net profits.

(c)     It is intended that the Joint Venture shall be the exclusive entity pursuant to which the parties shall participate in activities (i.e., live events, Clubplanet, Wantickets, and corporate marketing services similar in nature to those performed by the Company or AMG currently or during the term of the Joint Venture) initiated or materially occurring in Canada, and which involve Stephane McGarry's and/or Sol Shafer's participation (i.e., so long as they are employed by the Company and/or AMG, consistent with the terms of the November 1, 2006 Agreement between the Company and Stephane McGarry, a copy of which is annexed in Schedule 3. All of the Joint Venture's projects shall be subject to the prior written approval of both the Company and AMG, and the Company and AMG agree that any decisions that they make will be in the best interests of the Joint Venture. If a project is proposed by either AMG or the Company for the Joint Venture, and the other party elects not to approve the participation of the Joint Venture in such project, then the party proposing such project shall be permitted to engage in such project on its own (i.e., apart from the Joint Venture), and Mr. McGarry and/or Mr. Shafer may also participate in such project on their own, so long as their participation does not materially impact their performance of their respective duties for the Joint Venture.

(d)     The intended length of the Joint Venture and the terms and conditions of such will be datiled in the JVA.

(e)     If requested by either party, the books of the Joint Venture shall be handled by an accounting firm not then employed by the Company or AMG, with the expense of such firm to be shared equally by the Company and AMG.

6.      MySpace.

(a)     The Company acknowledges that it has been negotiating a potential arrangement with MySpace on behalf of its Wantickets/Clubplanet divisions. The Company agrees that if the arrangement currently being negotiated with MySpace is consummated prior to December 1, 2007, then the Company shall share with AMG ten percent (10%) of the Company's net profits arising from such arrangement, subject to the limitation that such share of such net profits shall not exceed Five Hundred Thousand Dollars ($500,000) during any twelve month period of the term of such arrangement.

(b)     For purposes of this Paragraph 6, net profits shall mean gross revenues actually received by the Company from the MySpace arrangement during the applicable twelve month period minus the aggregate of (i) direct out-of-pocket costs arising in connection with such arrangement and (ii) all operating and other expenses incurred by the Company that relate directly to the MySpace arrangement during such period. If there is a net loss during any such period, such loss shall be carried forward as an expense to be deducted from gross revenues for the subsequent period, for purposes of calculating AMG's share of net profits due for subsequent periods.

4

(c)     The Company shall deliver to AMG a statement detailing the calculation of the payment due AMG pursuant to this Paragraph 6 within thirty (30) days of the end of each twelve month period of the MySpace arrangement. Amounts payable to AMG shall accompany statements. AMG shall have the right, at its sole cost and expense to examine the Company's books and records regarding such calculation, for a period of one (1) year from the date a specific statement is rendered and only once with respect to any such specific statement. AMG shall notify the Company in writing of its election to conduct such an audit. Any such examination shall be for a reasonable duration, shall take place at the Company's offices during normal business hours not less than thirty (30) days following the Company's receipt of such notice from AMG.

(d)     Should AMG find any items that it believes to be errors in the examination of the Company's books and records then it will detail these findings in writing to the Company. The Company will have a period of 30 days following this to provide explanations to these errors. Should the parties not be able to agree on these items then an independent person will be appointed through a recognized international accountancy body to review the matter and both parties agree to abide by that persons decision as to whether these item's should be included in the statement.

(e) The Company agrees that should AMG find errors that are accepted or assessed by an independent person as in clause 6d then it will make immediate payment to AMG of the balancing amount due after the errors are removed from the statement. The Company further agrees that if these errors are for a figure greater than 10% of the amount that was due to be paid to AMG according to the statement then the Company will reimburse AMG for all costs that it has incurred in investigating the statement containing the errors.

7.     Global Gathering.

(a)     The Company acknowledges that AMG is the owner of the rights to the name "Global Gathering." AMG acknowledges that the Company and AMG jointly produced the first U.S. Global Gathering event in Miami, Florida in 2006, and that such event was financially unsuccessful, but that the parties believe that similar, subsequent events are more likely to be financially successful, in part due to the 2006 experience. In that connection, AMG agrees that if it elects to produce a Global Gathering event in Florida during the two year period following this Agreement, it shall give the Company notice of such election, and the Company shall thereafter have a thirty (30) day period to notify AMG that it has elected to jointly promote and manage that event with AMG, it being agreed that such joint promotion and managing will require the Company and AMG to share all costs, risks and net profits for such event on an equal basis, and to enter into a Joint Venture Agreement in relation to this event. AMG further agrees that once the Company elects to jointly promote and manage a Global Gathering event in Florida, the Company shall have the right, but not the obligation, to jointly promote and manage all subsequent versions of that event, it being further agreed that if the Company elects not to jointly promote and manage a subsequent version of that event, then the Company shall have no further right to jointly promote and manage further subsequent versions of that event.

(b)     The Company further acknowledges that AMG has granted Live Nation a right of first refusal to jointly produce Global Gathering events in the United States, exclusive of Florida. For a period of two years following the date of this Agreement AMG will grant the Company second option to participate in the joint production of any such event, it being understood by the Company that this option will only be offered by AMG to the Company should

Live Nation not exercise their right to become involved. The Company acknowledges that AMG's agreement with Live Nation requires the delivery of a business plan to Live Nation for them to make a decision on whether to exercise their option and that Live Nation has 7 (seven) days from receipt of such business plan to exercise the option. Should Live Nation fail to exercise their option then AMG will within 30 days from being advised of this furnish the Company with a Business Plan and the Company will have 14 days in which to exercise its option to jointly promote and manage the event. Should the Company not accept the option within 14 days then the option will expire. It is agreed that such joint promotion and managing will require the Company and AMG to share all costs, risks and net profits for such event on an equal basis, and to enter into a Joint Venture Agreement in relation to this event AMG further agrees that once the Company elects to jointly promote and manage a Global Gathering event outside Florida, the Company shall have the right, but not the obligation, to jointly promote and manage all subsequent versions of that event, it being further agreed that if the Company elects not to jointly promote and manage an event, then the Company shall have no further right to jointly promote and manage further subsequent versions of that event.

1. 8.    Public Statements.    The Company, AMG and the Sellers agree that neither they nor any of their members or shareholders will make, or cause to be made, any statement or communicate any information (whether oral or written) that disparages or reflects negatively on the other or any of their respective employees, members, representatives or affiliates. In addition, the Company, AMG and the Sellers agree that they will explain their failure to consummate the transactions contemplated by the Purchase Agreement as a recognition that AMG wanted to focus more on live event and nightclub consulting businesses, that the Company wanted to focus more on its online interactive business, and that they had concluded that they could not invest in all such businesses simultaneously, but that they will continue to work together in Canada and hope to jointly produce events in the future. Finally, the Company, AMG and the Sellers, on behalf of themselves and their members and shareholders agree to maintain the confidentiality of this Agreement, and to refrain from disclosing or making reference to its terms except as required by law or with their respective accountant or attorney.

9.    Non-Solicitation.

(a)    During the Non-Solicitation Period (defined below), neither the Company, AMG, the Sellers nor any of their respective Related Persons (defined below) shall knowingly, either directly or indirectly, for itself or for any other person or entity, (i) call upon, solicit or take away, or attempt to call upon, solicit or take away, any person then employed by the either of them or (ii) knowingly employ any employee of either of them who voluntarily terminates such employment until 12 months have passed following termination of such employment, unless such condition is waived by Company in writing. "Non-Solicitation Period" shall be the term of the Joint Venture as well as the twelve (12) month period following the termination of the Joint Venture. "Related Person" shall mean any person or entity who or which directly or indirectly, is controlled by or otherwise affiliated with McGarry or any person who is a member of his family.

(b)    During the term of the Joint Venture and for the twelve (12) months following the termination of the Joint Venture, neither the Company, AMG, the Sellers nor any Related Person shall knowingly, either directly or indirectly, for itself or for any other person or entity, enter into any agreement, or assist any other person or entity in entering into any agreement or other arrangement regarding any projects or clients introduced to the Company or AMG by the other, or acquired or developed by the Joint Venture prior to or during the term of

the Joint Venture unless the Company has ceased business relationships in relation to the project or the client prior to the solicitation.. The Company, AMG and the Sellers acknowledge that the financial terms detailed in this Agreement have been negotiated in consideration for the agreement of the parties to be bound by the terms detailed in this subparagraph 9(b), and that the parties would not have agreed to such terms if the parties had not agreed to be bound hereby.

10.    Effect of Termination; Mutual Release.

(a)    The Company, AMG and the Sellers acknowledge and agree that as the transactions contemplated by the Purchase Agreement were never consummated (i.e., no membership interests of the Company or shares of AMG were transferred), at all times prior to and after the date of this Agreement the Company was not the owner of AMG and the Sellers were not members of the Company, notwithstanding any actions of the Company, AMG, the Sellers or their respective shareholders or members that may suggest the contrary.  The Company, AMG and the Sellers, on behalf of themselves and on behalf of their respective members and shareholders further agree not to take any actions or positions in any forum that would be inconsistent with the prior sentence.

(b)    Without limiting anything contained in this Agreement, as used in this Agreement, the term "claims" shall include all claims, covenants, warranties, promises, undertakings, actions, suits, causes of action, obligations, debts, attorneys' fees, accounts, judgments, losses and liabilities, of whatsoever kind or nature, in law, equity or otherwise. Except as otherwise specifically set forth in this Agreement, for and in consideration of the execution of this Agreement, and other good and valuable consideration, each of the Company, AMG and the Sellers, for and on behalf of themselves and all of their respective direct and indirect parents, subsidiaries and affiliates, together with their respective officers, directors, partners, shareholders, employees and agents effective the date hereof, do fully and forever release, remise and discharge each other and all from any and all claims which the parties had, may have had, or now have against the other party, for or by reason of any matter, cause or thing whatsoever, including, without limitation, any claim arising out of or attributable to the failure to consummate the transactions contemplated by the Purchase Agreement, including but not limited to claims of breach of contract, wrongful termination, unjust dismissal, defamation, libel or slander, or under any federal, state or local law dealing with discrimination based on age, race, sex, national origin, handicap, religion, disability or sexual preference. This Release of claims does not include any matter described herein as continuing.

11.    Confidentiality. The Company, AMG and the Sellers, for and on behalf of themselves and all of their respective direct and indirect parents, subsidiaries and affiliates, together with their respective officers, directors, partners, shareholders, employees and agents (collectively, "Affiliates"), acknowledge and agree that in the course of their dealings, they have learned or received Confidential Information from each other. The term "Confidential Information" as used in this Agreement means (a) confidential information of one of them, including without limitation, information received from third parties, including clients, under confidential conditions, and (b) other technical, business or financial information or trade secrets or proprietary information (including, but not limited to, account records, client information, confidential plans for the creation or disposition of products, product development plans, marketing strategies and financial data and plans), the use or disclosure of which would be contrary to the interests of the party whose information it was, or its direct and indirect parents, subsidiaries and affiliates, or their respective officers, directors, partners, shareholders, employees and agents, or their respective clients. The Company, AMG and the Sellers, on behalf

7

of themselves and their Affiliates, understand and agree that such Confidential Information has been disclosed in confidence and for use only in the context of the Purchase Agreement and the consummation of the transactions contemplated thereunder. The Company, AMG and the Sellers, on behalf of themselves and their Affiliates, understand and agree that (i) they will keep such Confidential Information confidential at all times hereafter, and (ii) they will not make use of Confidential Information on their own behalf, or on behalf of any third party. "Confidential Information" shall not include information generally known to the public or in the industry.

12.    Representations and Warranties.

(a)    AMG and the Sellers, jointly and individually, represent and warrant to the Company that (i) AMG is a corporation duly organized, validly existing and in good standing under the laws of the England, (ii) AMG and the Sellers each has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, (iii) AMG and the Sellers are each unaware of any material fact undisclosed to the Company that, if known by the Company, would reasonably be expected to be material to the Company's decision to enter into this Agreement on the terms detailed herein, (iv) this Agreement is a valid and binding obligation of AMG and the Sellers, enforceable in accordance with its terms, and (v) to the knowledge of AMG and the Sellers, no other act, approval or proceedings on the part of either AMG, the Sellers or any other Person is, or will be, required to authorize the execution and delivery of this Agreement by either of them or the consummation of the transactions contemplated by this Agreement.

(b)    The Company represents and warrants to AMG that (i) the Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, (ii) the Company has the legal power and authority to enter into this Agreement and to perform its obligations hereunder, (iii) the Company is unaware of any material fact undisclosed to AMG that, if known by AMG, would reasonably be expected to be material to the AMG's decision to enter into this Agreement on the terms detailed herein, (iv) this Agreement is a valid and binding obligation of the Company, enforceable in accordance with its terms, and (v) no other act, approval or proceeding on the part of the Company is or will be required to authorize the execution and delivery of this Agreement by the Company or the consummation of the transactions contemplated by this Agreement.

13.    Indemnification.    The Company, AMG and the Sellers (jointly and severally) shall each indemnify, save and hold harmless the other and its successors, assigns, affiliates, agents and contractors, and their partners, officers, directors, and employees, from and against any damage, loss, claim, judgment or other liability or expense (including but not limited to reasonable attorneys' fees (including attorneys' fees incurred by a party to this Agreement in connection with indemnification hereunder) which may in any way arise out of any breach of any representation, warranty, agreement or covenant set forth in this Agreement or any act or omission arising in connection with this Agreement; provided such claim has been adjudicated or settled with the indemnifying party's consent, which consent shall not be unreasonably withheld. The indemnifying party acknowledges and agrees that the indemnified party reserves the right, without being required to do so, and without waiver of any indemnity hereunder, to defend any claim, action or lawsuit coming within the scope of this indemnity provision. The party to be indemnified shall promptly notify the indemnifying party of any such claim and indemnifying party shall have the right to participate in the defense thereof with counsel of its choice at its expense. This paragraph shall survive the termination or expiration of this Agreement.

8

14.    Governing Law; Jurisdiction.    This Agreement shall be governed by and be construed in accordance with the law of the State of New York, without regard however to the conflicts of laws principles thereof. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, or otherwise relating to, this Agreement shall be brought against Sellers or Buyer in the Federal or state courts located in the County of New York, State of New York.

15.    Notices.    All notices and other communications hereunder shall be in writing and shall be deemed duly given and delivered when delivered by messenger (including FedEx, DHL) or mailed by registered or certified mail, postage prepaid, return receipt requested, or transmitted by facsimile (with a "hard" copy sent concurrently by registered or certified mail, postage pre-paid), to the parties at the following addresses (or at such other address for a party as such party shall from time to time specify by like notice): If to the Company: The Management Group, LLC, 485 Madison Avenue, New York, New York 10022, Attn: Lee Heiman. If to AMG: The Barn, Cutlers Farm Business Centre, Edstone, Wootton Wawen, Henley in Arden B95 6DJ Great Britain. If to: Neil Moffitt, 3773 Howard Hughes Parkway, Suite 110N, Las Vegas, Nevada 89169. If to Peter Haywood: The Barn, Cutlers Farm Business Centre, Edstone, Wootton Wawen, Henley in Arden B95 6DJ Great Britain. If to James Algate: The Barn, Cutlers Farm Business Centre, Edstone, Wootton Wawen, Henley in Arden B95 6DJ Great Britain.

16.    Additional Acts.    The parties shall not take any action to frustrate the intent or operation of this Agreement or the terms and provisions hereof and each party shall act with the utmost good faith in its dealings in connection with the matters contemplated by this Agreement and its dealings with the other parties hereto.

17.    Entire Agreement; Waiver, Modifications; Headings.    This Agreement constitutes the complete and exclusive agreement among the parties with respect to the subject matter hereof and supersedes all prior discussions and understandings, whether written or oral, express or implied. No modification, discharge or waiver, in whole or in part, of any of the provisions hereof shall be valid unless in writing and signed by the party against whom the same is sought to be enforced. A failure or omission of any party hereto to insist, in any instance, upon strict performance by the other party of any term or provision of this Agreement or to exercise any of its rights hereunder shall not be deemed a modification of any term or provision hereof, or a waiver or relinquishment of the future performance of any such term or provision by such party, nor shall such failure or omission constitute a waiver of the right of such party to insist upon future performance by the other party of any such term or provision or any other term or provision of this Agreement. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement. Unless the context otherwise requires, the singular includes the plural, and the plural includes the singular.

18.    Counterparts.    This Agreement may be executed in two (2) or more counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement.

19.    Severability.    In the event that any provision of this Agreement is declared by a court of competent Jurisdiction to be void or unenforceable, the remainder of this Agreement shall not be affected thereby and shall remain in full force and effect to the extent feasible in the absence of the void and unenforceable provision. The parties furthermore agree to execute and deliver such amendatory contractual provisions to accomplish lawfully as nearly as possible the

goals and purposes of the provision so held to be void or unenforceable.

IN WITNESS WHEREOF, the parties hereto, intending legally to be bound, have caused this Agreement to be duly executed as of the date written on the first page of this Agreement.

ANGEL MUSIC GROUP LTD                    THE MANAGEMENT GROUP, LLC

By: _____            By: _____
Gary Turner, Director                   Lee Heiman, President

_____                _____
Peter Haywood                           James Algate

_____
Neil Moffitt

The undersigned, being all of the members of The Management Group, LLC ("TMG"), acknowledge that they have read the foregoing agreement and are hereby approving TMG's execution thereof, and agreeing to be bound by the terms of this Agreement as if they were parties thereto including, without limitation, the terms of the mutual release detailed in Paragraph 10 above. Each of the undersigned further acknowledges that as this Agreement has been drafted and negotiated by such company's representative, and as each of the undersigned's personal interests herein are, in certain instances, in conflict, each of the undersigned has been advised to seek his, her or its own legal representation, and failing that, to waive any conflict of interest that may arise in connection with the drafting and execution of this Agreement. In that connection, the undersigned who have not been advised by separate counsel do hereby agree to such waiver.

_____                _____
Lee Heiman                              Andrew Fox

_____                _____
Lisa Heiman                             David McComb

_____
Barak Schurr, as President of WS7 Media, LLC

EXHIBIT C

THE MANAGEMENT GROUP, LLC
485 MADISON AVENUE
NEW YORK, NY 10022

February 3, 2005

Mr. Nick McCabe
1100 West Avenue, Suite 410
Miami Beach, FL 33139

Re:    Employment Agreement

Dear Nick:

This letter, when signed by you, shall constitute our agreement (the "Agreement") with respect to your employment with The Management Group, LLC ("Company").

1.    Conditions to Employment: This Agreement shall be conditioned upon the closing (the "Closing") of the purchase by Company of the assets of Zeitgeist LLC ("CJ") (the "Transaction"), and shall be effective as of the date of the Closing.

2.    Position; Responsibilities:

(a)    You shall serve as Creative Director of Company, with responsibility for the art direction of Company's brand, websites, multimedia and printed materials, in addition to responsibility for the operation of Company's office in Miami, Florida. You shall perform the duties consistent with such office, as from time-to-time may be prescribed by Company's Board of Managers.

(b)    Subject to the foregoing and the other provisions of this Agreement, Company and you agree that during the term of your employment, you shall maintain the Miami office at 1100 West Avenue, Suite 410, Miami Beach, FL 33139, although Company shall be entitled to require you to open and manage (at Company's expense) an office in the Greater Miami area. You and Company agree that you shall execute your management responsibilities as instructed by the Managers of Company. You acknowledge that, although you will be the manager of the Miami office, you will not be authorized to enter into any agreements on behalf of Company or any of its affiliates or divisions, without the prior written authorization of both Lee Heiman and Andrew Fox, the Managers of Company, or their successors. You further acknowledge that all financial matters for the Miami office will be executed by Company's New York office, although Company may make arrangements for a local bank account for deposits and so that you can address nominal cash requirements for the office in a timely fashion.

3.    Term:    The term of this Agreement (the "Term") shall be for a period commencing on Monday February 14th, 2005 and continuing until December 31, 2009, unless earlier terminated by either party as permitted hereby. You agree that your employment after February 14th, 2007 shall be contingent on Company's ability to secure

2008 N M

INS approvals for your continued employment. Company shall use reasonable efforts to secure such approvals, but you agree that if Company is unable to secure such approvals, your employment shall cease as of the last date you are permitted to be employed by Company under applicable INS rules and regulations, and Company's financial obligation to compensate you for the subsequent employment periods detailed in this Agreement shall likewise terminate. If your employment continues beyond the Term, your employment shall be deemed employment "at will" during any such continuation, and shall likewise be subject to INS rules and regulations.

4.    Compensation:

(a)    Base Compensation:  Commencing upon the execution of this Agreement, you shall receive a base salary, calculated at the rate of Fifty-Five Thousand ($55,000) Dollars per annum for 2005, Sixty-Five Thousand ($65,000) Dollars per annum during 2006 and Seventy-Five Thousand ($75,000) Dollars per annum for 2007, Eighty-Five Thousand ($85,000) Dollars for 2008 and Ninety-Five Thousand ($95,000) Dollars for 2009, except that if the gross revenues of the Miami Office do not exceed $120,000 during 2006, the base salary for the remainder of the Term (i.e., commencing January 1, 2007) shall remain at Sixty-Five Thousand ($65,000) Dollars. 2009.) During each year of the Term, you shall also receive an annual non-accountable expense allowance of Ten Thousand ($10,000) Dollars per annum (payable in equal monthly payments), such expense allowance being in addition to the expense reimbursement right afforded by Paragraph 6 below. Your base compensation will be paid to you in accordance with Company's normal payroll practices, but no less frequently than monthly. Company shall be entitled to withhold from amounts payable to you any amounts that are required to be withheld by applicable law.

(b)    Bonus:  During each calendar year of the term of this Agreement (partial year for 2005), you will also receive an annual bonus in an amount equal to ten (10%) percent of the net profits of the Miami office. In calculating such net profits, Company shall mean only those gross revenues arising from projects originating with the Miami office (i.e., introduced to Company by personnel under your direct supervision (including you)) less (i) all expenses incurred by Company in connection with the operation of the Miami office during each calendar year of your employment, (ii) any other expenses incurred by Company in connection with projects originating with the Miami office and (iii) a 5% overhead charge for administrative functions which are to be executed by the New York office in the ordinary course. Gross revenues received during each calendar year shall be calculated on an actual receipts basis, and a statement of such gross revenues shall be provided to you no later than ten (10) business days following the end of the applicable year, and the bonus shall be paid with ten (10) days following your approval of such statement. You or an authorized representative shall have the right, at your sole cost and expense to examine Company's books and records regarding such calculation, for a period of one (1) year from the date a specific statement is rendered and only once with respect to any such specific statement. You shall notify Company in writing of your election to conduct such an audit. Any such examination

tmgnm.doc (1-A-50220)                                        2

area. Company agrees, however, that so long as its New York City based employees are provided medical insurance by Company, Company will use reasonable efforts to secure medical insurance for the employees in the Miami office (including you) which provides benefits comparable to those provided Company's New York based employees. Notwithstanding the foregoing, if such a policy would cost Company (on a per capita basis) in excess of 25% more than it pays for its then current medical insurance for New York based employees, then Company shall be permitted to secure a plan with lesser benefits at a cost which is comparable to the expense of its New York medical insurance, although prior to doing so, it will discuss your preferences and other possible options (e.g., reducing salary or benefits to offset increased costs). Company shall be under no obligation to continue to maintain any plan or program during the Term and makes no representation or warranty that any benefit plan or program existing now or any time during the Term will be maintained or that the benefits available thereunder will remain at the current level. You shall be entitled to no fewer than four (4) weeks of paid vacation during each year of the Term (and a pro rata portion thereof for any portion of the Term and any extension thereof that is less than a full year). The timing of said vacations shall be subject to the approval of Company's Board of Managers, which approval shall not be unreasonably withheld.

8.    Disability/Death.    If you shall become physically or mentally incapacitated and such incapacity shall prevent you from performing your duties hereunder, and such incapacity shall continue for a period of three (3) consecutive months or more or for shorter periods aggregating three (3) months or more in any twelve-month period, Company shall have the right (before the termination of such incapacity), at its option, to terminate your employment hereunder upon written notice. In the event of any such termination, Company's sole obligation to you shall be to pay you any accrued but unpaid salary and expense allowance to the date of such termination plus any annual bonus as and when it otherwise comes due. Company confirms that its payment obligations hereunder shall continue during any period of disability until Company exercises its right of termination, although such obligations shall be subject to deduction for any amounts paid to you pursuant to any disability insurance policy. In the event of your death, this Agreement shall automatically terminate except that Company shall (i) pay to your estate any accrued but unpaid salary and expense allowance, (ii) pay to your estate any bonus (for the portion of the year through the date of your death) as and when it otherwise comes due and (iii) provide (if permitted under the then applicable plan) your immediate family with a continuation of health benefits for a period of three (3) months following your death. Finally, if requested, you shall cooperate with Company's efforts to purchase a life insurance policy (at Company's expense) to fund such purchase obligation.

9.    Termination. Company may, by written notice, terminate your employment for Cause (as defined below), such Cause to be specified in the notice of termination. The following acts shall constitute "Cause" hereunder: (i) any willful or intentional acts or omissions having the effect of materially injuring the reputation, business or employment relationships of Company or its affiliates; (ii) conviction of, or plea of nolo contendere to, a misdemeanor involving moral turpitude, fraud or a felony;

(iii) breach of any representation, warranty or covenant contained in this employment agreement, (iv) any act relating to Company which constitutes fraud, theft, forgery or gross negligence or (v) your failure, neglect or refusal to perform your duties in the manner required by the employment agreement. With respect to the reasons described in paragraphs (iv) and (v), Company will, to the extent such reason is capable of being cured, provide you with notice of such reason and a period of ten (10) days within which to cure same. Following termination by Company for Cause, Company's sole obligation to you shall be to be to pay you any accrued but unpaid salary and expense allowance to the date of such termination. Company agrees that if it terminates this Agreement for Cause, and you subsequently receive a non-appealable court judgment confirming that such termination was a material breach of this Agreement, Company shall reimburse you for your reasonable legal fees and expenses incurred by you in connection with said claim, in addition to any other amounts Company may be obligated to pay you hereunder.

10.    Confidential Matters.  You shall keep secret all confidential matters of Company, and shall not disclose them to anyone outside of Company, either during or after your employment with Company, except disclosure of confidential matters will be permitted: (i) to Company, its affiliates and their respective advisors; (ii) if such confidential matters have previously become available to the public without your assistance or involvement; (iii) if required by any court or governmental agency or body or as otherwise required by law; (iv) if necessary to establish or assert your rights hereunder or under Company's Operating Agreement; or (v) if expressly consented to by Company. You shall deliver promptly to Company upon termination of your employment, or at any time Company may request, all confidential memoranda, notes, records, reports and other documents (and all copies thereof) relating to the business of Company which you may then possess or have under your control.

11.    Results and Proceeds of Employment.  You acknowledge that Company shall own all rights of every kind and character throughout the world in perpetuity in and to any material and/or ideas written, suggested or in any way created by you hereunder and all other results and proceeds of your services hereunder, including, but not limited to, all copyrightable material created by you within the scope of your employment. You agree to execute and deliver to Company such assignments or other instruments as Company may require from time to time to evidence Company's ownership of the results and proceeds of your services.

12.    Notices.  All notices, requests, consents and other communications required or permitted to be given hereunder ("Notices") shall be in writing and shall be deemed to have been duly given if delivered personally or sent by prepaid nationally recognized overnight courier, or mailed first-class, postage prepaid, by registered or certified mail (return receipt requested). Notices shall be sent to you at the address set forth above. Notices shall be sent to Company at the address set forth above by giving attention of Andrew Fox, with a courtesy copy to Patrick McNamara, Esq., Rubin Bailin Ortoli Mayer & Baker, LLP, 405 Park Avenue, 15th Floor, New York, NY 10022. Either you or Company may change the address to which notices are to be sent by giving written notice of such change or address to the other in the manner herein provided for giving

notice. Such notices, requests, consents and other communications shall be effective when actually received at the required address, as confirmed by affidavit or written receipt. Notice to counsel shall not be deemed notice to a party.

13.    Miscellaneous.

(a)    You and Company represent and warrant to each other that you are each free to enter into this Agreement and, as of the commencement of the Term hereof, are not subject to any conflicting obligation or any disability which will prevent you or it from or interfere with your executing and performing your and its respective obligations hereunder.

(b)    You acknowledge that while you are employed hereunder you will comply with Company's non-discrimination and anti-sexual harassment policies and all other corporate policies, as in effect from time to time, of which you are made aware.

(c)    This Agreement sets forth the complete and exclusive agreement and understanding of the parties hereto, and supersedes and terminates any and all prior agreements, arrangements and understandings whether written or oral, express or implied. No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not herein set forth.

(d)    The provisions of this Agreement shall inure to the benefit of the parties hereto, their heirs, legal representatives, successors and permitted assigns. This Agreement, and your rights and obligations hereunder, may not be assigned by you, other than by will or laws of descent.

(e)    This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument executed by both of the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provision hereof shall in no manner affect the right at a later time to enforce the same. No waiver by either party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

(f)    This Agreement shall be governed by and construed according to the laws of the State of New York as applicable to agreements executed in and to be wholly performed within such State. In the event of any dispute arising under this Agreement, the parties hereto hereby irrevocably submit to the exclusive jurisdiction of

the Federal and State courts located in the County and State of New York and each waives any objection thereto based on lack of venue, _forum_ _non_ _conveniens_ or any similar-type grounds.

If the foregoing correctly sets forth our understanding, please sign and return the duplicate copy of the letter enclosed herewith.

Very truly yours,

THE MANAGEMENT GROUP, LLC

By: _____

Andrew Fox, CEO and Manager

Accepted and Agreed:

Nick McCabe

EXHIBIT D

THE MANAGEMENT GROUP, LLC
485 MADISON AVENUE
NEW YORK, NY 10022

As of June 20, 2007

Mr. Nick McCabe
1504 Bay Road, #1104
Miami Beach, FL 33139

Dear Nick:

As discussed, you and we have mutually agreed to terminate your employment prior to the date provided in your February 3, 2005 employment agreement (the "2005 Agreement"). This letter agreement shall confirm the terms of such early termination and modify the 2005 Agreement. Any terms which are used below and which are defined in 2005 Agreement shall have the same meanings and definitions as set forth in the 2005 Agreement.

1.  Your employment with the Company shall be deemed terminated as of June 20, 2007.

2.  You hereby waive all claims to additional compensation due you under the 2005 Agreement including, without limitation, any claims to bonuses payable pursuant to subparagraph 4(b) of the 2005 Agreement.

3.  We hereby agree that the restrictions of subparagraph 5(c) of the 2005 Agreement shall not be applicable to Bacardi Corporation ("Bacardi"), it being agreed that Bacardi is permanently excluded and exempted from the restrictions in subparagraph 5(c). You acknowledge that we are awaiting execution of an agreement with Bacardi (the "July Bacardi Agreement"), and you agree to continue to use your best efforts to insure that Bacardi executes the July Bacardi Agreement in due course. We acknowledge that you will be hired by Bacardi to act as a liaison between the Company and Bacardi as it relates to the execution of our responsibilities under the July Bacardi Agreement. We further acknowledge and agree that you will be paid by Bacardi directly a fee equal to 5% of our fee for the July Bacardi Agreement, and that such payment shall reduce the amount paid to us by Bacardi, and we waive any claims to such fee. Similarly, you waive any claims to any interest in payments made by Bacardi to us for services provided in connection with our services for Bacardi.

4.  You agree to maintain the confidentiality of this letter, and to refrain from disclosing or making reference to any of its terms except as required by law or with your accountant or attorney, who shall be bound by this confidentiality provision. You agree that you shall not make, or cause to be made, any statement or communicate any information (whether oral or written) that disparages or reflects negatively on the Company or any of its employees or members. The Company shall not make or cause to be made, any statement or communicate any information (whether oral or written) that disparages or reflects negatively on you.

5.  Except as expressly provided herein, all other terms and conditions of the 2005 Agreement are hereby ratified and confirmed and will remain in full force and effect including, without limitation, the non-solicitation and non-competition provisions contained in subparagraphs 5(b) and 5(c) of the 2005 Agreement, and you acknowledge that your confirmation and ratification are material conditions of the Company's execution of this letter agreement.

This letter agreement and the 2005 Agreement sets forth the complete and exclusive agreement and understanding of the parties hereto, and supersede and terminate any and all prior agreements, arrangements and understandings whether written or oral, express or implied. No representation, promise or inducement has been made by either party that is not embodied in this Agreement, and neither party shall be bound by or liable for any alleged representation, promise or inducement not herein set forth.

If the foregoing correctly sets forth your understanding, please sign and return the duplicate copy of the letter enclosed herewith.

Very truly yours,

THE MANAGEMENT GROUP, LLC

By: _____

Lee Heiman, President

Accepted and Agreed:

_____

Nick McCabe

EXHIBIT E

From: Nick McCabe [mailto:xxxxxxxxxx@gmail.com]
Sent: Wednesday, August 08, 2007 9:00 AM
To: Lee Heiman
Subject: B-Live LA Show

Hey Lee,

I talked to Bacardi regarding the LA show yesterday. Their feeling is
that although they want to move ahead with a show, the budget is much
tighter than Miami/NYC and cannot accommodate fees for both me and
Track. They want me to increase my role and time on B-Live now that
Marta has gone, and so I need to increase my fees accordingly, as this
and the NYC show are likely to take up most of my time between now and
November.

Instead they want to use a smaller local vendor at a much lower fee to
handle production, and have me consult on and coordinate the overall
show. It's not a reflection on Track's work on the Miami and NYC
shows, they just feel that our roles overlap a lot in terms of the
work that happens pre-show, and they would end up spending a large
portion of the budget on fees.

If they had to move ahead with a similar fee structure to NYC and
Miami they would not be able to do LA at all, so this is really the
only option.

cheers,

Nick


SCLAIMER: This e-mail message and any attachments are intended solely for
e use of the individual or entity to which it is addressed and may
ntain information that is confidential or privileged.  If you are not the
tended recipient, you are hereby notified that any dissemination,
stribution, copying or other use of this message or its attachments is
rictly prohibited.  If you have received this message in error, please
tify the sender immediately and permanently delete this message and any
tachments.

is email has been scanned by the MessageLabs Email Security System.
r more information please visit http://www.messagelabs.com/email

EXHIBIT F



Nov 1, 2007

Dear Anu,

We are pleased to offer you the position of 'Director of Interactive Sales and Marketing' with Angel Music Group. You will be responsible initially for overseeing sales and marketing efforts for NapkinNights and other AMG web properties in all West Coast markets, including but not limited to Arizona, California, Nevada and Washington State. You will also have the option to oversee additional states outside the West Coast as they are launched.

This letter when signed by both parties will constitute a binding agreement between Angel Music Group and yourself regarding employment with the company, subject to the terms detailed below.

Your employment with AMG will begin on or before December 1st, 2007, and continue until terminated by either party. The terms of your employment are as follows:

• Salary of $55,000 per annum, to be reviewed annually

• Commission bonus of 15% of gross sales directly generated by you, calculated and paid on a monthly basis

• All approved travel costs will be covered by AMG, including flights, hotels and work related entertainment costs

• Full medical benefits (with optional employee-paid dental) will be covered once you reach 90 days of employment

• 15 days of vacation and 5 personal days per year

• Assistance with relocation to Las Vegas, including $1,500 toward travel costs. You will be required to move to Las Vegas by Jan 8, 2008

If these terms are acceptable please sign this letter and fax back to 702-425-9390. We look forward to working with you.

_____          _____

Neil Moffitt                              Anu Dhami

2904 W. Horizon Ridge Parkway · Suite 121 · Henderson, NV 89052

Phone 702.425.9399 · Facsimile 702.425.9390

EXHIBIT G

# Angel Music Group

From Wikipedia, the free encyclopedia

**Angel Music Group** (AMG) was set up in early 2005 as a management company for various dance music groups in the United Kingdom, including Godskitchen, Global Gathering, Polysexual, and others.

In addition to their music assets, the company also is responsible for several large scale music festivals around the world, including Global Gathering, Hi-Fi, and also the ownership and management of the nightclub Air, in Birmingham.

In June of 2006, AMG merged with the United States company Track Entertainment, after partnering with them on the successful US version of the Global Gathering festival in March of 2006. The merger gave them a solid footprint in all the major music markets in the United States. The joint venture was short-lived, and AMG now competes directly with Track through new joint ventures with the photo community web site Napkin Nights, event producers Live Nation, and the interactive services company Trinity Street.

In late 2007, AMG partnered with US nightclub owner and operator Jon Bakhshi, the visionary behind New York hot-spots Home and GuestHouse. New projects include nightclubs in Ameristar properties, the first of which is slated to open in December 2007 in the Ameristar Resort and Casino in St. Charles. In addition, the group is beginning work on the first eco-friendly club in the US, to be called "Greenhouse." Greenhouse made its debut in October 2007 with a launch party during Paris Fashion Week, hosted by Carmen Kass and Jessica Stam.

**Angel Music Group** (Record Label) was set up in the summer of 2005 by EMI Music UK & Ireland as an umbrella company to look after its Innocent and EMI Classics labels. At the time, the Innocent label was looking after such acts as Blue, Atomic Kitten, and Billie Piper. Since then, the Innocent label has been left to the side as the Angel bosses resurrected the Charisma label, who at one time boasted acts like Genesis and Peter Gabriel.

Since then, the acts on the label have changed dramatically. Although Blue have since disbanded, Simon Webbe stayed with Charisma to pursue a solo career and has put out two albums under the Charisma label. The French soloist Camille also survived the Innocent/Charisma changeover

Since 2005, Angel has been on an A&R mission searching for new acts to fill its roster. Head of A&R Elias Christas has spearheaded the campaign which has brought over Phil Campbell, the Scottish born singer/songwriter; Alphabeat, the Danish pop act; Tom Baxter, the UK singer/songwriter; and Julian Velard the Brooklyn-born singer.

As well as looking after the homegrown acts on Charisma, the Angel Music Group also handles the accounts for a lot of EMI's overseas talent. There is a deal with Hollywood Records (the music arm of Disney) which has acts like the Plain White T's, Vanessa Hudgens, and Hilary Duff. Angel are also responsible for looking after the French dance DJ David Guetta.

## See also

- List of record labels

## External links

http://en.wikipedia.org/wiki/Angel_Music_Group

- Official site (http://www.angelmusicgroup.com/)
- Official Label Page (http://www.angelmusicgroup.net/)
- Home, Guest-House site (http://www.homeguesthouse.com/)
- Greenhouse site (http://www.greenhouseusa.com/)

Retrieved from "http://en.wikipedia.org/wiki/Angel_Music_Group"

Categories: EMI | British record labels | Dance music record labels | Record labels established in 2005

- This page was last modified 20:00, 4 January 2008.
- All text is available under the terms of the GNU Free Documentation License. (See **Copyrights** for details.)
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a U.S. registered 501(c)(3) tax-deductible nonprofit charity.

Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,                                    Index No.

                              Plaintiffs,


                   - against -

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

                              Defendants.

------------------------------------------------------------------------x




### PLAINTIFFS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR ORDER TO SHOW CAUSE
### FOR PRELIMINARY INJUNCTIVE RELIEF AND FOR INTERIM RESTRAINTS






DAVIDOFF MALITO & HUTCHER LLP
*Attorneys for Plaintiffs*
605 Third Avenue - 34th Floor
New York, New York  10158
(212) 557-7200

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 2

STATEMENT OF FACTS ......................................................................................... 3

ARGUMENT ............................................................................................................. 3

    POINT I ................................................................................................................ 3

    THE LEGAL STANDARD .................................................................................. 3

    POINT II ............................................................................................................... 4

    THE RELIEF REQUESTED HEREIN SHOULD BE GRANTED ..................... 4

        A. Likelihood of Success on the Merits .......................................................... 4

        B. Irreparable Harm ........................................................................................ 6

        C. Balancing of the Equities ........................................................................... 7

CONCLUSION ......................................................................................................... 8

# TABLE OF AUTHORITIES

Page

## Cases

Aetna Ins. Co. v. Capasso,
  75 N.Y.2d 860 (1990) .............................................................................................................. 3

American Building Maintenance Co. of New York v. Acme Property Servs., Inc.,
  515 F. Supp.2d 298 (N.D.N.Y. 2007) ...................................................................................... 4

Churchill Communications Corp. v. Demyanovich,
  668 F. Supp. 2d 207 (S.D.N.Y. 1987)....................................................................................... 5

Creative Collections of New York, Inc. v. DiBlasi,
  15 Misc.3d 1130(A) (Sup. Ct. Erie Co. 2007) ......................................................................... 5

David Fox & Sons, Inc. v. King Poultry Co.,
  47 Misc. 2d 672 (Sup. Ct. N.Y. Co. 1964) ............................................................................... 5

Doe v. Axelrod,
  73 N.Y.2d 748 (1988) .............................................................................................................. 3

Duane Jones Co. v. Burke,
  306 N.Y. 172 (1954) ................................................................................................................ 4

Harry R. Defler Corp. v. Kleeman,
  19 A.D.2d 396 (4th Dep't 1963)........................................................................................... 4, 5

Laro Maintenance Corp. v. Culkin,
  255 A.D.2d 560 (2d Dep't 1998) ............................................................................................. 7

Town & Country House & Home Serv., Inc. v. Newbery,
  3 N.Y.2d 554 (1958) ................................................................................................................ 4

U.S. Re Companies, Inc. v. Scheerer,
  41 A.D.3d 152 (1st Dep't 2007) .............................................................................................. 3

W.T. Grant Co. v. Srogi,
  52 N.Y.2d 496 (1981) .............................................................................................................. 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,                                    Index No.

                              Plaintiffs,

                      - against -

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

                              Defendants.

------------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR ORDER TO SHOW CAUSE
## FOR PRELIMINARY INJUNCTIVE RELIEF AND FOR INTERIM RESTRAINTS

Plaintiffs, The Management Group, LLC ("TMG"), Andrew Fox ("Mr. Fox") and Lee

Heiman ("Mr. Heiman") (collectively, "Plaintiffs"), respectfully submit the instant memorandum of

law in support of their application for: (a) a temporary restraining order and a preliminary

injunction enjoining and restraining defendants, Angel Music Group Ltd. ("Angel"), Neil Moffitt

("Moffitt"), Nick McCabe ("McCabe"), Jessie Angles ("Angles"), Anu Dhami ("Dhami"), Isabel

Piaggi ("Piaggi") and Dan A. Vidal ("Vidal") (collectively, "Defendants"), and their agents and

employees, from using and/or continuing to use TMG's confidential and proprietary business

information and trade secrets and from directly or indirectly soliciting any of TMG's present or

former customers or employees; and (b) an order of protection prohibiting Moffitt and his agents

and employees from assaulting, stalking, menacing, recklessly endangering, intimidating,

threatening, annoying, contacting, communicating, slandering or defaming Messrs. Fox and

Heiman, and their respective wives and children, and other family members, friends and associates.

00370842

## PRELIMINARY STATEMENT

The within request for injunctive relief is both urgent and compelling. In short, Defendants are not only seeking to destroy TMG's business by misappropriating and exploiting TMG's highly confidential and proprietary business information but Moffitt has also threatened Mr. Fox's very life! Simply put, Moffitt is a truly menacing figure and a bully who has already physically assaulted Mr. Fox and bragged to Messrs. Fox, Heiman and their partners about how he is engaged in money laundering and tax evasion in both the United States and the United Kingdom.

While the parties were briefly partners, Moffitt and his co-conspirators, McCabe, Angles, Dhami, Piaggi and Vidal, had access to TMG's most confidential and proprietary information and trade secrets including, but not limited to, TMG's business models and plans, TMG's corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences. Although TMG agreed to dissolve its business relationship with Moffitt and his company, Angel, by entering into a Termination Agreement with restrictive covenants prohibiting the use of TMG's confidential information, Angel and Moffitt have simply ignored these provisions and continued violating our rights. In addition, McCabe has flagrantly breached similar restrictive covenants contained in his employment agreement and Angles, Dhami, Piaggi and Vidal have breached their common law fiduciary duties to TMG by using its confidential and proprietary information to wrongfully solicit its customers.

Armed with this highly proprietary and confidential information, Defendants have engaged in numerous acts of unfair competition by undercutting TMG's prices, stealing TMG's customers and soliciting TMG's employees. Indeed, Moffitt has vowed to destroy TMG's business "piece-by-piece."

2

As recently as last week, Plaintiffs learned that Angel had stolen one of TMG's most important clients, Tiesto, which generates approximately $1,000,000 in revenues and that McCabe was meeting with another one of our clients, Vidal Partners, in a further wrongful attempt to steal its business. Without immediate injunctive relief, Defendants will not rest until TMG's business and precious goodwill are irreparably destroyed. Even more ominously, without an order of protection, Messrs. Fox and Heiman fear that their very lives and that of their families may be endangered. Plaintiffs urge this Court to immediately grant their application for this emergency relief.

## STATEMENT OF FACTS

The facts are set forth in detail in the accompanying Affidavit of Andrew Fox, with exhibits, sworn to on February 26, 2008 (the "Fox Aff."), to which the Court is respectfully referred.

## ARGUMENT

## POINT I

## THE LEGAL STANDARD

The standards that govern the granting of preliminary injunctive relief are well settled. Such relief should be granted where the party seeking such relief demonstrates that: (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm if such relief is not granted; and (3) the balance of the equities is in its favor. Aetna Ins. Co. v. Capasso, 75 N.Y.2d 860, 862 (1990); Doe v. Axelrod, 73 N.Y.2d 748 (1988); W.T. Grant Co. v. Srogi, 52 N.Y.2d 496, 517 (1981); U.S. Re Companies, Inc. v. Scheerer, 41 A.D.3d 152, 154 (1st Dep't 2007). The decision whether to grant the relief is a matter of discretion. Doe, 73 N.Y.2d at 750.

As set forth below, each of the three preliminary injunction elements militate in favor of this Court exercising its discretion to: (a) enjoin and restrain Defendants, and their agents and employees, from using and/or continuing to use TMG's confidential and proprietary business

00370842

3

information and trade secrets and from directly or indirectly soliciting any of TMG's present or former customers or employees; and (b) enjoin and restrain Moffitt and his agents and employees from assaulting, stalking, menacing, recklessly endangering, intimidating, threatening, annoying, contacting, communicating, slandering or defaming Messrs. Fox and Heiman, and their respective wives and children, and other family members, friends and associates.

### POINT II

### <u>THE RELIEF REQUESTED HEREIN SHOULD BE GRANTED</u>

A.    <u>Likelihood of Success on the Merits</u>

TMG is likely to succeed on its claim for a permanent injunction because of the express provisions of the restrictive covenants set forth in the Termination Agreement and in McCabe's Employment Agreement.  In fact, TMG would likely prevail on its claim for a permanent injunction even in the absence of a restrictive covenant.

"It has been well-established that an employee, who has had entrusted to him confidential information pertaining to the conduct and clientele of his employer's business which he would not have obtained were it not for his status as a trusted employee and which affords him an advantage over other competitors to whom the information is not available, may not subsequently use that information to further his own ends." <u>Harry R. Defler Corp. v. Kleeman</u>, 19 A.D.2d 396, 401 (4th Dep't 1963).  <u>Accord</u>, <u>Town & Country House & Home Serv., Inc. v. Newbery</u>, 3 N.Y.2d 554 (1958); <u>Duane Jones Co. v. Burke</u>, 306 N.Y. 172 (1954); <u>American Building Maintenance Co. of New York v. Acme Property Servs., Inc.</u>, 515 F. Supp.2d 298, 310 (N.D.N.Y. 2007) (applying New York law).

"This restriction arises because of the confidential nature of the employment relationship and is not dependent upon the presence in the employment agreement of a provision limiting

activities after cessation of employment." Harry R. Defler Corp., 19 A.D.2d at 401.  Moreover, an

injunction may issue against the former employee's new employer so as to prevent the former

employee from accomplishing indirectly what he is prohibited from doing directly.  Id. at 402.

In cases in which a former employee misuses confidential information obtained in the course

of his former employment, the former employer is entitled to a permanent injunction against such

activities in addition to compensation for damages already sustained.  Id. (granting former employer

a permanent injunction).  Accord, David Fox & Sons, Inc. v. King Poultry Co., 47 Misc. 2d 672

(Sup. Ct. N.Y. Co. 1964) (same); Creative Collections of New York, Inc. v. DiBlasi, 15 Misc.3d

1130(A), at *4 (Sup. Ct. Erie Co. 2007) (court granted preliminary injunction even in the absence of

a restrictive covenant holding that "the misappropriation of the plaintiff's business information and

goodwill is not something that can be adequately remedied at law.  The Courts have recognized the

need for an injunction under such circumstances").

Indeed, the fact that Defendants are misusing TMG's confidential and proprietary

information and trade secrets for Moffitt's specific purpose of seeing TMG's business "destroyed"

particularly militates in favor of injunctive relief.  Under similar circumstances, in Churchill

Communications Corp. v. Demyanovich, 668 F. Supp. 2d 207 (S.D.N.Y. 1987), the court held that:

> An additional consideration justifying injunctive relief, which is
> equitable in nature and unrelated to the existence of a restrictive
> covenant, comes into play where there is evidence that a former
> employee has 'pursued a particular course of conduct with the
> intention of injuring or destroying his former employer's business.'

Id. at 213 (citations omitted).

On these standards, TMG is likely to prevail on its claim for a permanent injunction.  As

former partners and employees of TMG, Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal had

access to TMG's confidential and proprietary information and trade secrets.  Defendants have taken

00370842                                    5

that information and are now using it to unfairly compete with TMG and for the specific purpose of

destroying TMG's business.  The misused information includes TMG's business models and plans,

TMG's corporate strategies, financial and marketing plans, operational practices, sales figures,

pricing and customer identities, specifications and preferences (see Fox Aff. at ¶¶ 3-4).  Defendants'

actions are indisputably in violation of both their contractual obligations as set forth in the

restrictive covenants contained within the Termination Agreement and McCabe's Employment

Agreement, as well as the New York common law articulated in the above-cited authorities.  And,

as recognized by New York courts, TMG is without an adequate remedy at law insofar as the

continuation of Defendants' unlawful activities will no doubt result in the destruction of TMG's

goodwill and ultimately of its business.

Messrs. Fox and Heiman are also likely to prevail on their claim for an order of protection.

Moffitt has physically assaulted and threatened Mr. Fox (see Fox Aff. at ¶ 2).  Moffitt's actions

constitute criminal conduct which this Court has the power to and should enjoin.

## B.    **Irreparable Harm**

TMG is likely to suffer irreparable harm if the requested relief is not granted.  Defendants

have been using TMG's confidential and proprietary information and trade secrets to unfairly

compete with TMG.  In addition, Defendants' continued theft of TMG's clients and personnel will

have a crippling effect on TMG's business.  Without immediate injunctive relief, TMG will suffer

irreparable injury because TMG's business will be destroyed and any award of damages TMG

receives will constitute nothing more than a pyrrhic victory.

Messrs. Fox and Heiman are also likely to suffer irreparable harm if an order of protection is

not granted.  At stake are their lives and the lives of their family.  Even in the best case scenario, in

which Moffitt does not act on his threats, Messrs. Fox and Heiman should not be compelled to live

00370842                                    6

in a continuous state of fear and apprehension for which money damages could never provide adequate compensation.

## C.    **Balancing of the Equities**

The equities balance in favor of granting preliminary injunctive relief when the failure to grant such relief would cause greater injury to the movant than the imposition of the injunction would cause the non-movant. Laro Maintenance Corp. v. Culkin, 255 A.D.2d 560, 561 (2d Dep't 1998).

Here, as set forth above, TMG will be irreparably harmed if the requested relief does not issue and Defendants are permitted to continue to use TMG's proprietary and confidential information and trade secrets in order to unfairly compete with TMG and to poach TMG's clients and personnel. Because Defendants do not have a legal right to use TMG's proprietary and confidential information and trade secrets, and to poach TMG's clients and personnel, Defendants will not be significantly harmed if the injunction issues and its activities are curtailed pending a final determination of TMG's request for a permanent injunction. Thus, the balance of the equities is in TMG's favor.

As also set forth above, Messrs. Fox and Heiman will be irreparably harmed if an order of protection does not issue. Absent an order of this Court, Moffitt will likely continue his previous course of conduct and perhaps escalate it. Of course, there is absolutely no harm to Moffitt that can be caused by an order requiring him to cease engaging in such criminal activities. The balance of equities clearly favors Messrs. Fox and Heiman.

00370842

## **CONCLUSION**

For all of the foregoing reasons, and those set forth in the Fox Affidavit, the relief requested

by plaintiffs should be granted in its entirety.

Dated: New York, New York
       February 26, 2008

DAVIDOFF MALITO & HUTCHER LLP

By:_____
       Larry Hutcher
       Peter M. Ripin
       *Attorneys for Plaintiffs*
       605 Third Avenue
       New York, New York 10158
       (212) 557-7200



At an IAS Part 5⁄2 of the Supreme Court of the State of New York held in and for the County of New York at the Courthouse located at 60 Centre Street, New York, NY on the 28 of February, 2008.

004885
002949

HON.
_____
J.S.C.

**MOTION SEQUENCE #** 001

-----------------------------------------------------------X

THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,

Plaintiffs,

- against -

ANGEL MUSIC GROUP LTD., NEIL MOFFITT,
NICK McCABE, JESSIE ANGLES, ANU DHAMI,
ISABEL PIAGGI, and DAN A. VIDAL,

Defendants.

-----------------------------------------------------------X

Index No. 600584/08

**ORDER TO SHOW CAUSE**

UPON reading and filing the annexed Affidavit of Andrew Fox, sworn to February 26, 2008, and the exhibits annexed thereto, and Affidavit of Lee Heiman, sworn to February 26, 2008, and the complaint filed in this action by plaintiffs The Management Group, LLC ("TMG"), Andrew Fox and Lee Heiman (collectively, "Plaintiffs"), it is

ORDERED, that defendants Angel Music Group Ltd., Neil Moffitt ("Moffitt"), Nick McCabe, Jessie Angles, Anu Dhami, Isabel Piaggi and Dan A. Vidal (collectively, "Defendants"), or their attorneys, show cause before this Court at I.A.S. Part 26, Room 218, at the Courthouse located at 60 Centre Street, New York, New York, on the 6 day of March, 2008 at 9:30 am, or as soon thereafter as counsel may be heard, why an order should not be entered pursuant to Article 63 of the CPLR i) preliminarily enjoining Defendants, directly or indirectly, and whether acting alone or in concert

00370877

with others, including any officer, agent, employee and/or representative of any of the Defendants, until further Order of this Court, from using and/or continuing to use TMG's confidential and proprietary business information and from directly or indirectly soliciting any of TMG's present or former customers or employees and ii) preliminarily enjoining Moffitt, directly or indirectly, and whether acting alone or in concert with others including his officers, agents, employees and/or representatives, until further Order of this Court, from assaulting, stalking, menacing, recklessly endangering, intimidating, threatening, annoying, contacting, communicating, slandering or defaming plaintiffs Andrew Fox and Lee Heiman and their respective wives, children, other family members, friends and associates; and it is further

ORDERED, that pending the hearing of this motion, i) Defendants, directly or indirectly, and whether acting alone or in concert with others, including any officer, agent, employee and/or representative of any of the Defendants, be and they hereby are temporarily restrained and enjoined from using and/or continuing to use TMG's confidential and proprietary business information and from directly or indirectly soliciting any of TMG's present or former customers or employees and ii) Moffitt, directly or indirectly, and whether acting alone or in concert with others including his officers, agents, employees and representatives, be and hereby is temporarily restrained and enjoined from assaulting, stalking, menacing, recklessly endangering, intimidating, threatening, annoying, contacting, communicating, slandering or defaming plaintiffs Andrew Fox and Lee Heiman and their respective wives, children, other family members, friends and associates; and it is further

ORDERED, that sufficient reason appearing therefor, let service of a copy of this Order to Show Cause, together with the papers upon which it is based, on Defendants or their counsel, in accordance with the service provisions of the CPLR, on or before the _28_ day of February, 2008, be deemed good and sufficient service herein; and it is further

00370877

- 2 -

ORDERED, that answering papers, if any, shall be served so as to be received by Plaintiffs'

counsel, Davidoff Malito & Hutcher LLP, 605 Third Avenue, New York, NY 10158, at least ___ days

before the return date of this application or by no later than the 5th day of March, 2008; and it is

further

ORDERED, that Plaintiffs may submit reply papers to any answering papers submitted to the

Court by Defendants or their attorneys in connection with this application.

ENTER:

_____

J. S. C.

ORAL ARGUMENT
DIRECTED

_____
J.S.C.

00370877

- 3 -