Thomas J. Luz  (TL-4665)
Karaahmetoglu & Luz Firm, LLP
1500 Broadway, 21st Floor
New York, New York 10036
(212) 681-8313
*Attorneys for Defendants Nick McCabe, Jessie Angles,*
*Anu Dhami, Isabel Piaggi, and Dan A. Vidal*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE MANAGEMENT GROUP, LLC, ANDREW      :
FOX, and LEE HEIMAN,                    :
                                        :
                        Plaintiffs,     :
                                        :
              - against -               :      08-02172 (PKC)
                                        :
ANGEL MUSIC GROUP LTD., NEIL MOFFITT,   :
NICK McCABE, JESSIE ANGLES, ANU DHAMI,  :
ISABEL PIAGGI, and DAN A. VIDAL,        :
                                        :
                                        :
                        Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**AFFIRMATION OF THOMAS J. LUZ**
**IN SUPPORT OF MOTION TO DISMISS**

STATE OF NEW YORK    )
                     :      SS.:
COUNTY OF NEWYORK    )

        THOMAS J. LUZ, an attorney duly admitted to practice before the Courts of the

State of New York, affirms under penalty of perjury that:

        1.      I am a member of the bar of this Court and of Karaahmetoglu & Luz Firm,

LLP, attorneys for Defendants Nick McCabe, Jessie Angles, Anu Dhami, Isabel Piaggi, and Dan

Vidal in this action.

        2.      I make this affidavit to submit the document in support of the motion to

dismiss of Dhami, Piaggi, Angles and Vidal for lack of personal jurisdiction.

3.    A copy of the complaint is annexed as Exhibit 1.

WHEREFORE, the motion to dismiss the complaint as against the Individual Defendants should be granted.

June 13, 2008

_____/s/_____
Thomas J. Luz

DAVIDOFF MALITO & HUTCHER LLP
605 Third Avenue
New York, New York 10158
(212) 557-7200
Larry Hutcher (LH-8327)
Peter M. Ripin (PR-6950)
Gary I. Lerner (GL-5382)



*Attorneys for Plaintiffs*
*The Management Group, LLC, Andrew Fox and Lee Heiman*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

THE MANAGEMENT GROUP, LLC,
ANDREW FOX and LEE HEIMAN,                    :    08 Civ. 2172 (PKC)
                                              :
                              Plaintiffs,     :    Hon. P. Kevin Castel
                - against -                   :
                                              :    **AMENDED COMPLAINT**
ANGEL MUSIC GROUP LTD., NEIL MOFFITT,         :
NICK McCABE, JESSIE ANGLES, ANU DHAMI,        :
ISABEL PIAGGI, and DAN A. VIDAL,              :
                                              :
                              Defendants.     :

------------------------------------------------------------x

Plaintiffs, The Management Group, LLC ("TMG"), Andrew Fox ("Mr. Fox") and Lee

Heiman ("Mr. Heiman"), by and through their attorneys, Davidoff Malito & Hutcher LLP, by

way of Amended Complaint against defendants Angel Music Group Ltd. ("Angel"), Neil Moffitt

("Moffitt"), Nick McCabe ("McCabe"), Jessie Angles ("Angles"), Anu Dhami ("Dhami"), Isabel

Piaggi ("Piaggi") and Dan A. Vidal ("Vidal") (collectively, "Defendants"), allege and state as

follows:

**NATURE OF THE ACTION**

1.      This action seeks to redress Defendants' shocking and blatant attack on plaintiffs'

business, as well as threats of physical violence directed against Mr. Fox.  In short, plaintiffs'

00373555

former partner, Moffitt, has not only vowed to destroy plaintiffs' business by misappropriating and exploiting plaintiffs' highly confidential and proprietary business information but has also threatened Mr. Fox's very life. Simply put, Moffitt is a truly menacing figure and a bully who has already physically assaulted Mr. Fox and bragged to Messrs. Fox, Heiman and their partners about how he is engaged in money laundering and tax evasion in both the United States and the United Kingdom.

2.      While plaintiffs and Moffitt were briefly partners, Moffitt and his co-conspirators McCabe, a former minority partner and employee of TMG, and Angles, Dhami, Piaggi and Vidal, former TMG employees, had access to plaintiffs' most confidential and proprietary information and trade secrets including, but not limited to, plaintiffs' business models and plans, plaintiffs' corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences. Armed with this highly proprietary and confidential information, these individual defendants and their business entity, Angel, have engaged in numerous acts of unfair competition by undercutting plaintiffs' prices, stealing plaintiffs' customers and soliciting plaintiffs' employees. Indeed, Moffitt has vowed to destroy plaintiffs' business "piece by piece."

3.      Plaintiffs seek equitable relief in the form of an injunction against Defendants' acts of business piracy, a protective order against Moffitt to protect against his threats of physical violence and campaign of harassment and slander and an accounting to enable plaintiffs to ascertain the extent of Defendants' unlawful conduct and the damages caused thereby. Plaintiffs also seek substantial monetary damages arising from the various Defendants': (a) breaches of contract; (b) breaches of fiduciary duty; (c) unfair competition; (d) conversion; (e)

misappropriation of trade secrets; (f) tortious interference with contractual and business

relationships; and (g) fraud.

## THE PARTIES

4.    Plaintiff, The Management Group, LLC, is a New York limited liability company

with its principal place of business located at 485 Madison Avenue, New York, New York

10022.

5.    Plaintiff, Andrew Fox, is an individual who currently resides in the State of New

York.

6.    Plaintiff, Lee Heiman, is an individual who currently resides in the State of New

York.

7.    Defendant, Angel Music Group Ltd., is upon information and belief, a United

Kingdom corporation with its principal place of business located at 2904 W. Horizon Ridge

Parkway, Suite 121, Henderson, Nevada 89052.

8.    Defendant, Neil Moffitt, is an individual who, upon information and belief,

currently resides at 2640 Mirabella Street, Henderson, Nevada 89052.

9.    Defendant, Nick McCabe, is an individual who, upon information and belief,

currently resides at 1504 Bay Road, #1104, Miami Beach, Florida 33139.

10.    Defendant Jessie Angles, is an individual who, upon information and belief,

currently resides at 5724 SW 146 Court, Miami FL 33183.

11.    Defendant Anu Dhami, is an individual who, upon information and belief,

currently resides at 104 Calle Cuervo, San Clemente, CA 92672.

12.    Defendant Isabel Piaggi is an individual who, upon information and belief,

currently resides at 6225 SW 87th Avenue, Miami FL 33173.

13.     Defendant Dan A. Vidal is an individual who, upon information and belief, currently resides at 4510 NE 2nd Avenue #4, Miami FL 33137.

## JURISDICTION

14.     This Court has original jurisdiction over the claims asserted herein under 28 U.S.C. § 1332(a) because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000. Venue is proper in this district under 28 U.S.C. § 1391.

15.     This Court has personal jurisdiction over Angel, Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal pursuant to CPLR 302(a) because these defendants transact business within the State of New York and the claims arise out of that business activity.

16.     Additionally, this Court has personal jurisdiction over defendants Angel and Moffitt pursuant to contract, to wit: paragraph 14 of the Agreement dated as of March 1, 2007 by and among The Management Group, LLC, Angel Music Group Ltd, Neil Moffitt, Peter Haywood and James Algate (the "Termination Agreement"). The Termination Agreement provides, in relevant part:

> Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, or otherwise relating to, this Agreement shall be brought [by any party against the other] in the Federal or state courts located in the County of New York, State of New York.

17.     Additionally, this Court has personal jurisdiction over defendant McCabe pursuant to contract, to wit: paragraph 13(f) of the Employment Agreement dated as of February 3, 2005, by and among The Management Group, LLC and Nick McCabe (the "Employment Agreement"), as modified by the parties thereto by letter dated as of June 20, 2007 (the "Modification Agreement"). The Employment Agreement provides, in relevant part:

> In the event of a dispute arising under this Agreement, the parties hereto irrevocably submit to the exclusive jurisdiction of the

Federal and State courts located in the County and State of New
York and each waives any objection thereto based on lack of
venue, forum non conveniens or any similar-type grounds.

## FACTUAL ALLEGATIONS

### A.     TMG, Angel and Their Relationship

18.     TMG is a holding company which owns Track Entertainment ("Track"), a

diversified entertainment, media and lifestyle company.  Track's media properties include the

world's leading online nightlife destination, Clubplanet.com, event and lifestyle oriented

websites including NewYears.com. nocheLatina.com and CoolJunkie.com, and an online

ticketing agent, Wantickets.com.

19.     Mr. Fox is the Chief Executive Officer and is an owner and operator of TMG and

its affiliated companies and websites.

20.     Mr. Heiman is the President and is an owner and operator of TMG and its

affiliated companies and websites.

21.     Angel is an entertainment/event management company for dance music groups

which is responsible for several large scale music festivals in the United Kingdom, including the

"Global Gathering Festival."

22.     Upon information and belief, Moffitt is a citizen of the United Kingdom and the

Chairman and Chief Executive Officer of Angel.

23.     In or about August 2005, Mr. Fox met Moffitt at the Global Gathering Festival

and decided to work together to plan the first Global Gathering in the United States in March

2006.

24.     During the period leading up to the show, Mr. Fox began discussing a possible

merger with Moffitt.  Among other things, Messrs. Fox and Heiman believed that this acquisition

would complement TMG's existing business and provide opportunities for expanding Angel's allegedly highly profitable festivals to other areas around the world, including the United States, thereby extending TMG's production business, services and relationships with global sponsors. In addition, ticketing for the festivals would be handled through Wantickets.com, TMG's proprietary ticketing property. Finally, the acquisition would extend the reach of TMG's other proprietary websites, including Clubplanet.com, and TMG's sales division which worked with Fortune 500 companies which advertised on these websites.

**B.    The Purchase Agreement**

25.    By an Agreement dated as of May 19, 2006 (the "Purchase Agreement"), TMG agreed to purchase all of Angel's shares from Moffitt and his two partners.

26.    After the merger, Messrs. Heiman, Fox and Moffitt each owned 23.75% of TMG and served as TMG's sole Managers. Although Moffitt's partners executed employment agreements which TMG prepared for all three sellers, Moffitt failed to sign his agreement.

**C.    The Disastrous Post-Merger Events**

27.    After the closing, Angel produced two smaller shows which were both unsuccessful and lost over 700,000 GBP.

28.    In addition, Angel's updated financial statements reflected a debt of 325,000 GBP allegedly incurred by Moffitt which had never been previously recorded on Angel's books and records. Obviously, Messrs. Heiman and Fox were shocked to learn of this. When they inquired about this alleged indebtedness, they were told that Moffitt had "deferred and altered" his payment schedule to Angel prior to the acquisition. Ultimately, Messrs. Heiman and Fox concluded that Moffitt had misappropriated more than $600,000 from Angel for his own benefit which he failed to previously disclose.

29.    To make matters worse, Moffitt grossly abused his expense account and spent more than $25,000 per month on personal expenses including airfare for his wife and paramour to visit him in Las Vegas where he was now living.  At the same time, Moffitt began second-guessing TMG's decisions and criticizing almost every aspect of its operations.  As TMG's cash flow grew progressively worse, Moffitt simply stopped working.

30.    By September 2006, TMG's losses totaled approximately $1 million.

31.    Even more ominously, however, Moffitt began bullying and threatening Mr. Fox. On one occasion, while dining at a London restaurant, Messrs. Heiman and Fox attempted to question Moffitt about his excessive spending and expenses and he erupted in a childish fit of rage and literally pushed Mr. Fox off his chair to the floor!  Another time, when Mr. Fox was leaning over to put his briefcase into the trunk of his car, Moffitt pushed him into the trunk and said he could make Mr. Fox "disappear."  In addition, Moffitt regularly regaled Messrs. Heiman and Fox with stories of how he resorted to violence to achieve his goals.  For example, he advised us that, on one occasion, he was able to "persuade" his ex-partner to terminate their business relationship by dangling him upside down over a banister with his head directly above a cement floor.  He seemed particularly proud -- and repeatedly bragged -- about the fact that he did not pay taxes in either the U.S. or the U.K.  In short, Moffitt considers himself "above the law."

32.    Prior to the merger, both TMG and Angel had been sued for trademark infringement by an individual claiming ownership of the name "Global Gathering" (the "Global Gathering Litigation").  Thereafter, as the Global Gathering Litigation grew more heated, TMG was forced to pay an exorbitant amount of legal fees – totaling more than $500,000 – to the attorneys whom Moffitt engaged to represent TMG.

33.     In short, the merger with Angel had turned into a nightmare. When Moffitt

approached Messrs. Heiman and Fox in February 2007 and suggested that the parties terminate

the Purchase Agreement and limit their relationship to a proposed joint venture in Canada,

Messrs. Heiman and Fox happily agreed.

**D.    The Termination Agreement**

34.     The Termination Agreement terminated the Purchase Agreement and "unwound"

the transaction. However, the parties agreed that within sixty (60) days following the execution

of the Termination Agreement, they would negotiate a joint venture arrangement in Canada in

good faith using reasonable efforts. Pursuant to paragraph 5 of the Termination Agreement, the

parties agreed that the work of the joint venture would be performed by a corporate entity owned

equally by TMG and Angel, that this entity would employ both of TMG's Canadian employees,

Stephane McGarry and Sol Shafer, and that Angel would reimburse TMG for start-up expenses

totaling $32,000 prior to any division of net profits.

35.     The parties also agreed that as part of the termination process certain restrictive

covenants were necessary. Accordingly, in paragraph 11 of the Termination Agreement, the

parties agreed and acknowledged that they each had access to, and acquired, confidential

information from each other and that the use or disclosure of this information would be contrary

to the interests of the party whose information it was. Thus, the Termination Agreement

provided:

> The term "Confidential Information" as used in this Agreement
> means (a) confidential information of one of them, including
> without limitation, information received from third parties,
> including clients, under confidential conditions, and (b) other
> technical, business or financial information or trade secrets or
> proprietary information (including but not limited to, account
> records, client information, confidential plans for the creation or
> disposition of products, product development plans, marketing

strategies and financial data and plans) .... The [Parties], on behalf
of themselves and their Affiliates, understand and agree that such
Confidential Information has been disclosed in confidence and for
use only in the context of the Purchase Agreement and the
consummation of the transactions contemplated thereunder. The
[P]arties on behalf of themselves and their Affiliates, understand
and agree that (i) they will keep such Confidential Information
confidential at all times hereafter, and (ii) they will not make use
of Confidential Information on their own behalf, or on behalf of
any third party.

(Emphasis added.)

36.    In addition, paragraph 9 of the Termination Agreement provided that during the

term of the joint venture and for twelve months thereafter, neither party would:

> (a) [E]ither directly or indirectly, for itself or for any other person
> or entity, (i) call upon, solicit or take away, any person then
> employed by either of them or (ii) knowingly employ any
> employee of either of them who voluntarily terminates such
> employment until 12 months have passed following the
> termination of such employment, unless such condition is waived
> by the Company in writing . . ..
>
> (b) [E]ither directly or indirectly, for itself or for any other person
> or entity, enter into any agreement, or assist any other person or
> entity in entering into any agreement or other arrangement
> regarding any projects or clients introduced by the Company or
> [Angel] by the other, or acquired or developed by the Joint Venture
> prior to or during the term of the Joint Venture unless the
> Company has ceased business relationships in relation to the
> project or the client prior to the solicitation.

37.    In paragraph 2 of the Termination Agreement, Angel agreed to use its best efforts

to secure the landlord's consent to TMG's assignment to Angel of the Las Vegas lease where

Moffitt had his office.  In addition, Angel agreed to assume and be responsible for the payment

of rent.

38.    In paragraph 3 of the Termination Agreement, Angel agreed to pay all future legal

fees in the Global Gathering Litigation and to use its best efforts to cooperate with TMG in its

efforts to extricate itself from that lawsuit. TMG agreed that Angel was the owner of the rights to the name "Global Gathering."

39.     In paragraph 13 of the Termination Agreement, the parties agreed to an indemnification provision which provided, *inter alia*, for the payment of reasonable attorneys' fees incurred by a party to the Termination Agreement in connection with a dispute arising thereunder. Thus, the Termination Agreement provided:

> The Company, AMG and the Sellers (jointly and severally) shall each indemnify, save and hold harmless the other and its successors, assigns, affiliates, agents and contractors, and their partners, officers, directors, and employees, from and against any damage, loss, claim, judgment or other liability or expense (including but not limited to reasonable attorneys' fees (including attorneys' fees incurred by a party to this Agreement in connection with a dispute hereunder)) which may in an way arise out of any breach of any representation, warranty, agreement or covenant set forth in this Agreement or any act or omission arising in connection with this Agreement; provided such claim has been adjudicated or settled with the indemnifying party's consent, which consent shall not be unreasonably withheld...

**E.     Defendants' Breaches of the Termination Agreement and Other Wrongful Conduct Designed to Destroy TMG's Business**

40.     Unfortunately, shortly after executing the Termination Agreement, Moffitt began disavowing each of the obligations which he had agreed to. First, he no longer wanted to be part of the Canadian joint venture and would not reimburse TMG for its start-up costs of $32,000. Instead, Moffitt attempted to solicit the head of TMG's Canadian operation, Mr. McGarry, to work for Angel. Although Mr. McGarry declined these entreaties, upon information and belief, Moffitt continues to solicit Mr. McGarry. In total, TMG lost approximately $100,000 as a result of Moffitt's breach of the joint venture provision.

41.     In addition, Angel breached its obligation to pay all future legal fees incurred in the Global Gathering Litigation and to use its best efforts to extricate TMG from that lawsuit.

On the contrary, shortly after executing the Termination Agreement, TMG was advised that
Angel had reached its own separate settlement in the Global Gathering Litigation leaving TMG
as the only remaining defendant in a lawsuit alleging infringement of a trademark that TMG
never owned!  Needless to say, TMG did not receive advance notice of the settlement and was
not informed of the settlement amount.  To make matters worse, TMG's attorney was
subsequently advised by plaintiff's attorney in the Global Gathering Litigation that Moffitt had
offered to assist the plaintiff in the prosecution of this lawsuit against TMG!

     42.    Not surprisingly, Angel also did not comply with its obligation to use its best
efforts to secure the landlord's consent to the assignment of the Las Vegas lease and to assume
and be responsible for the payment of the rent.  On the contrary, shortly after executing the
Termination Agreement, Moffitt advised Messrs. Heiman and Fox that he was moving out of the
space and leaving them "on the hook" for the lease payments.  Ultimately, TMG was required to
pay the landlord $47,000 to terminate the lease.

     43.    In June 2007, plaintiffs received a phone call from McCabe, TMG's Chief
Creative Officer, who advised that he was resigning from TMG.  McCabe had been a minority
partner and worked for TMG for more than two years, was instrumental in developing creative
campaigns for TMG's key client, Pepsi, and was the account manager for Bacardi, another one
of TMG's most important clients.  Since McCabe was such an important part of TMG's team,
plaintiffs asked him to reconsider and offered him a six month extension on his Employment
Agreement.  Alternatively, plaintiffs reminded McCabe that if McCabe left, McCabe would be
bound by the confidentiality, non-solicitation and non-competition provisions set forth in his
Employment Agreement.

     44.    In particular, paragraph 10 of McCabe's Employment Agreement provided:

You shall keep secret all confidential matters of Company, and shall not disclose them to anyone outside of Company, either during or after your employment with Company, except disclosure of confidential matters will be permitted: (i) to Company, its affiliates and their respective advisors; (ii) if such confidential matters have previously become available to the public without your assistance or involvement; (iii) if required by any court or governmental agency or body or as otherwise required by law; (iv) if necessary to establish or assert your rights hereunder or under Company's Operating Agreement; or (v) if expressly consented to by Company. You shall deliver promptly to Company upon termination of your employment, or at any time Company may request, all confidential memoranda, notes, records, reports and other documents (and all copies thereof) relating to the business of Company which you may then possess or have under your control.

45.    Paragraph 5(b) of McCabe's Employment Agreement provided:

During the Non-Solicitation Period (defined below), neither you nor any Related Person (defined below) shall knowingly, either directly or indirectly, for himself or for any other person or entity, (i) call upon, solicit or take away, or attempt to call upon, solicit or take away, any person then employed by Company or (ii) knowingly employ any employee of Company who voluntarily terminates such employment until twelve (12) months have passed following termination of such employment, unless such condition is waived by Company in writing. "Non-Solicitation Period" shall mean the period from the date hereof until twelve (12) months after the termination of your employment with Company. "Related Person" shall mean any person or entity who or which, directly or indirectly, is controlled by or otherwise affiliated with you or any person who is a member of your family.

46.    Paragraph 5(c) of McCabe's Employment Agreement provided:

During the term of your employment with Company and for the twelve (12) months following termination of such employment, neither you nor any Related Person shall knowingly, either directly or indirectly, for himself or for any other person or entity, enter into any agreement, or assist any other person or entity in entering into any agreement or other arrangement regarding any projects or clients introduced to Company or acquired or developed by Company or you prior to or during the term of your employment by Company.

47.    Shortly after plaintiffs reminded McCabe of these provisions, McCabe retained the same lawyer who had represented Moffitt. After several weeks of negotiations, TMG agreed to modify McCabe's Employment Agreement to allow him to continue working with Bacardi. TMG based this very hard decision solely upon McCabe's representation that if TMG allowed McCabe to continue working with Bacardi, as a liaison and salesperson, McCabe would insure that TMG continued handling the coordination and production for Bacardi's events. In short, TMG elected to let McCabe work so that TMG could protect this account. Indeed, McCabe repeatedly assured TMG that since TMG had already had a highly successful track record of producing profitable shows for Bacardi, he would not change a winning formula. In addition, McCabe stated that he did not have the necessary experience or background to handle production for these type of high profile events by himself. The Modification Agreement did not change any of McCabe's other obligations concerning confidentiality, non-solicitation and non-competition existing under the Employment Agreement.

48.    Since TMG's relationship with Bacardi was extremely lucrative, TMG did not want to do anything to jeopardize it. In March 2007, TMG had produced a highly successful show for Bacardi in Miami and earned a production fee of $122,000. TMG was awaiting execution of an agreement with Bacardi to produce its October 2007 show in New York where TMG was projecting a profit of over $300,000. In addition, TMG had already begun working on site inspections and creating a budget for Bacardi's scheduled November 2007 Los Angeles show and were also anticipating producing the March 2008 Miami show. Indeed, TMG projected earning more than $500,000 in fees for both of these shows. Accordingly, TMG entered into the Modification Agreement with McCabe which specifically exempted Bacardi from the non-solicitation and non-competition provisions of the Employment Agreement.

49.     Unfortunately, TMG was grossly misled. Two days after TMG signed the
Modification Agreement with McCabe, TMG's lead designer, defendant Angles, who worked
with McCabe in Miami, abruptly quit without explanation except to say that he wanted to be a
consultant. On August 8, 2007, McCabe emailed plaintiffs to say that Bacardi had advised him
that since its budget for the Los Angeles event was much tighter than for previous events, it
could not "accommodate" fees for both McCabe and TMG. In addition, McCabe stated that he
would be "consulting and coordinating" the overall show and Bacardi would use a "small local
vendor at a much lower fee" to handle production.

50.     Thereafter, however, TMG learned that Moffitt's partner, Peter Haywood, the
Managing Director of Angel, had flown in from the UK and been hired as a "consultant" to
oversee the November 2007 Los Angeles event and that Angel would be producing the entire
March 2008 Miami event. In addition, TMG discovered that both McCabe and Angles were now
employed by Angel. In short, Moffitt had solicited McCabe and Angles and thereafter
fraudulently conspired with them to steal Bacardi from TMG.

51.     When TMG confronted Moffitt about this egregious betrayal, he was extremely
arrogant and unapologetic. Moffitt stated that he was extremely "bitter" towards TMG and Mr.
Fox, in particular; that TMG would regret ever "crossing swords" with Moffitt; and that he
intended to "destroy" TMG and all of its affiliated properties. Significantly, both Moffitt and his
co-conspirators, defendants McCabe, Angles, Dhami, Piaggi and Vidal, had access to TMG's
most confidential and proprietary information and trade secrets, including, but not limited to,
TMG's business models and plans, TMG's corporate strategies, financial and marketing plans,
operational practices, sales figures, pricing and customer identities, specifications and

preferences. Armed with this and using highly proprietary and confidential information, Defendants are intent on destroying TMG's business piece-by-piece.

52.     First, knowing full well that TMG had actively sought to acquire NapkinNights.com, a nightlife website which directly competes with TMG's own website, Clubplanet.com, Moffitt did an end run around TMG and instead secured an interest in the website for Angel. In addition, Moffitt entered into a joint venture with Trinity St., a ticketing company which Moffitt knew we were also seeking to do a joint venture with and which competes directly with TMG's own proprietary ticketing vehicle, Wantickets.com. Indeed, Moffitt solicited and stole TMG's sales representative for Wantickets.com, defendant Dhami, so that she could instead work directly for Trinity St. and NapkinNights. Significantly, Dhami is now using TMG's confidential information to wrongfully solicit its customers. In total, Moffitt wrongfully solicited seven (7), and eventually stole five (5), of TMG's employees in violation of the confidentiality and non-solicitation provisions of the Termination Agreement.

53.     Thus, in or about December 2007, Moffitt solicited and stole defendants Piaggi and Vidal, TMG's regional sales manager and national photo editor, respectively, both of whom had access to highly confidential information concerning TMG's customers and pricing for its proprietary website, CoolJunkie.com. Thereafter, Piaggi and Vidal went to work for Angel and are now using TMG's confidential information to wrongfully solicit its customers.

54.     In addition, Defendants engaged in numerous other acts of unfair competition by undercutting TMG's prices and soliciting and/or stealing TMG's customers and employees. Indeed, only recently, the joint venture between Angel and Trinity St. used TMG's confidential information to steal Tiesto, a $1,000,000 client of TMG. In short, Defendants' conspiracy to

exploit and misappropriate TMG's confidential information and steal TMG's business was so

brazen that Angel submitted the following entry to Wikipedia, the free online encyclopedia:

> In June of 2006, [Angel] merged with the United States company
> Track Entertainment, after partnering with them on the successful
> US version of the Global Gathering festival in March of 2006. The
> merger gave them a solid footprint in all the major markets in the
> United States. <u>The joint venture was short-lived and [Angel] now
> competes directly with Track through new joint ventures with the
> photo community web site Napkin Nights, event producers Live
> Nation, and the interactive services company Trinity Street.</u>

(Emphasis added.)

55.     As if this heinous business piracy were not enough, Moffitt has also made

threatened Mr. Fox's life; slandered and disparaged Messrs. Heiman and Fox to their business

associates; and taunted Messrs. Heiman and Fox with emails in which he reiterated his intention

of destroying TMG's business.

### COUNT I
### (BY FOX AND HEIMAN AGAINST MOFFITT FOR A PERMANENT INJUNCTION)

56.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs

"1" through "55" hereof as if set forth in full herein.

57.     Moffitt's physically violent conduct toward Mr. Fox, and his unlawful threats,

have and will continue to cause irreparable harm to Messrs. Fox and Heiman.

58.     By reason of the foregoing, Messrs. Fox and Heiman are entitled to permanent

injunctive relief directing Moffitt to: (a) stay away from Messrs. Fox and Heiman, their wives,

children and/or other family members at any and all locations, including, but not limited to, their

homes, places of business, schools and/or day care centers; (b) refrain from communicating with

Messrs. Fox and Heiman, their wives, children and/or other family members by any means

whatsoever, including, but not limited to, mail, facsimile, email, telephone and voicemail; (c)

refrain from assaulting, stalking, harassing, menacing, recklessly endangering, intimidating, threatening or annoying Messrs. Fox and Heiman, their wives, children and/or other family members; and (d) refrain from making any statements, whether written or oral, public or private, that disparage, denigrate or defame Messrs. Fox and Heiman, their wives, children and/or other family members.

59.     Messrs. Fox and Heiman have no adequate remedy at law.

## COUNT II
### (BY TMG AGAINST ALL DEFENDANTS FOR A PERMANENT INJUNCTION)

60.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "59" hereof as if set forth in full herein.

61.     Pursuant to the Termination Agreement, Angel and Moffitt were prohibited from unfairly competing with TMG, soliciting its clients and employees, and disclosing its confidential and proprietary information.

62.     Pursuant to his Employment Agreement, McCabe was similarly prohibited from unfairly competing with TMG, soliciting its clients and employees, and disclosing its confidential and proprietary information.

63.     Similarly, under New York common law, all of the Defendants were prohibited from unfairly competing with TMG by using its confidential and proprietary information to secure an advantage over TMG.

64.     As set forth above, Angel and Moffitt have breached their contractual, fiduciary and common law obligations by: (a) soliciting TMG's employees, including but not limited to, Stephane McGarry and defendants McCabe, Angles, Dhami, Piaggi and Vidal; (b) unfairly competing with TMG, including but not limited to, through the acquisition of NapkinNights.com and through the joint venture with Trinity Street; and (c) using TMG's confidential and

proprietary information and trade secrets to compete with TMG and to destroy TMG's business, including but not limited to undercutting TMG's prices, stealing customers and stealing business opportunities.

65.    As also set forth above, defendants McCabe, Angles, Dhami, Piaggi and Vidal breached their contractual, fiduciary and/or common law obligations by: (a) soliciting TMG's employees; (b) unfairly competing with TMG through their employment with Angel; and (c) using TMG's confidential and proprietary information and trade secrets to injure and destroy TMG's business including, but not limited to, assisting his current employer, Angel, to undercut TMG's prices, steal TMG's customers and steal TMG's business opportunities.

66.    TMG has no adequate remedy at law.

67.    By reason of the foregoing, TMG is entitled to a permanent injunction enjoining and restraining Defendants from: (a) soliciting TMG's employees; (b) unfairly competing with TMG; and (c) using TMG's confidential and proprietary information.

## COUNT III
## (BY TMG AGAINST ANGEL, MOFFITT AND MCCABE FOR BREACH OF CONTRACT)

68.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "67" hereof as if set forth in full herein.

69.    The Termination Agreement is a valid and binding contract that seeks to protect TMG's property, confidential information, trade secrets, customer and personnel relationships, and good will.

70.    McCabe's Employment Agreement is a valid and binding contract that seeks to protect TMG's property, confidential information, trade secrets, customer and personnel relationships, and good will.

71.    Pursuant to the Termination Agreement, Angel and Moffitt were prohibited from unfairly competing with TMG, soliciting its customers, soliciting its employees and using or disclosing TMG's confidential and proprietary information and trade secrets.

72.    Pursuant to the Employment Agreement, McCabe was prohibited from unfairly competing with TMG, soliciting its customers (except, pursuant to the Modification Agreement, Bacardi), soliciting its employees and using or disclosing TMG's confidential and proprietary information and trade secrets.

73.    Angel and Moffitt have breached and continue to be in breach of the Termination Agreement, by reason of their having:  (a) solicited TMG's employees; (b) unfairly competed with TMG; and (c) used TMG's confidential and proprietary information.  Additionally, Angel has breached and continues to be in breach of the Termination Agreement by reason of its having: (i) failed to proceed with the Canadian Joint Venture; (ii) failed to reimburse TMG for the start-up expenses incurred in connection with the Canadian Joint Venture; (iii) failed to pay legal fees incurred by TMG in the Global Gathering Litigation; (iv) failed to use its best efforts to extricate TMG from the Global Gathering Litigation; and (v) failed to secure the landlord's consent to the assignment of the Las Vegas lease and to assume and be responsible for the payment of the rent.

74.    McCabe has breached and continues to be in breach of his Employment Agreement by reason of his having:  (a) solicited TMG's customers and employees; (b) unfairly competed with TMG; and (c) used TMG's confidential and proprietary information.

75.    As a direct and proximate result of Angel, Moffitt and McCabe's breaches of their respective contracts, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of confidentiality of its trade secrets and other damages.

76.     By virtue of the foregoing, Angel, Moffitt and McCabe are further liable to TMG for compensatory damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT IV
### (BY TMG AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

77.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "76" hereof as if set forth in full herein.

78.     At all relevant times, defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal owed fiduciary duties of fidelity and loyalty to TMG and, additionally, were obligated to act in good faith and to deal fairly with TMG.

79.     Defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal breached their fiduciary duties by, inter alia, misappropriating, and then using, TMG's confidential and proprietary information and trade secrets learned while employed by TMG.

80.     As a direct and proximate result of the wrongful conduct of defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal, TMG suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of confidentiality of its trade secrets and other damages.

81.     By virtue of the foregoing, TMG is entitled to receive an amount equal to the total remuneration TMG paid to defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal during their employment with TMG. Additionally, defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT V
## (BY TMG AGAINST ANGEL FOR AIDING AND
## ABETTING BREACH OF FIDUCIARY DUTY)

82.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "81" hereof as if set forth in full herein.

83.     As employees of TMG, defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal owed TMG a duty of fidelity and loyalty.

84.     The theft by defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal of TMG's confidential information and use of such information to set up or further a competing business constitutes breaches of their fiduciary duties to TMG.

85.     Angel knew about the theft of TMG's confidential information by defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal and participated in such breach of fiduciary duties.

86.     By virtue of the foregoing, Angel is liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT VI
## (BY TMG AGAINST ALL DEFENDANTS FOR UNFAIR COMPETITION)

87.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "86" hereof as if set forth in full herein.

88.     Through the wrongful conduct of defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal, as more fully described above, Angel is engaged in an unfair method of competition and/or deceptive acts or practices.

89.     As a results of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

90.     By virtue of the foregoing, Defendants are liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT VII
## (BY TMG AGAINST ALL DEFENDANTS FOR CONVERSION)

91.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "90" hereof as if set forth in full herein.

92.     As described above, Defendants have exercised and continue to exercise unauthorized dominion and control over TMG's property, including confidential and proprietary information belonging to TMG.

93.     TMG has an immediate right to possession of such property.

94.     As a result of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

95.     By virtue of the foregoing, Defendants are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT VIII
## (BY TMG AGAINST ALL DEFENDANTS
## FOR MISAPPROPRIATION OF TRADE SECRETS)

96.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "95" hereof as if set forth in full herein.

97.     TMG's business models and plans, corporate strategies, financial and marketing plans, operational practices, sales figures, pricing and customer identities, specifications and preferences constitute trade secrets and are subject to protection.

98.    This information was kept secret by TMG and was not generally known or available to third-parties to whom it would provide actual or potential economic value.

99.    This information was subjected to reasonable security measures to maintain secrecy and confidentiality.

100.    As described above, Defendants misappropriated TMG's trade secrets by acquiring such trade secrets through improper means and then improperly using such trade secrets.

101.    As a direct and proximate cause of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

102.    By virtue of the foregoing, TMG is entitled to immediate injunctive relief, and Defendants are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

### COUNT IX
### (BY TMG AGAINST ALL DEFENDANTS FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS)

103.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "102" hereof as if set forth in full herein.

104.    As described above, TMG has long-standing contractual and/or business relationships with its clients and personnel. Further, at the time of the wrongful acts committed by Defendants, TMG had a tangible expectancy of continuing the relationships which TMG had developed with those clients and personnel.

105.    At all relevant times herein, Defendants were aware of those business relationships.

00373555                                    -23-

106.    Defendants intentionally and tortiously, with improper motive and without justification or excuse, interfered and/or are planning or attempting to interfere with those relationships.

107.    TMG has suffered damages due to Defendants' conduct because but for Defendants' inducement, certain TMG personnel and clients including, but not limited to, Bacardi would not have terminated their relationships with TMG and TMG would have obtained contracts with other clients and personnel with whom TMG had prospective business relationships.

108.    Defendants have specifically interfered with TMG's prospective business relationships and have damaged the goodwill that TMG has worked to achieve.

109.    As a result of Defendants' conduct, TMG has suffered and will continue to suffer substantial financial loss, loss of goodwill, loss of the confidentiality of its trade secrets and other damages.

110.    By virtue of the foregoing, TMG is entitled to immediate injunctive relief and Defendants are further liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT X
## (BY TMG AGAINST ALL DEFENDANTS FOR *PRIMA FACIE* TORT)

111.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "110" hereof as if set forth in full herein.

112.    Defendants, acting in concert and each with the aid of the others, have conspired to cause, and have in fact caused, injury to TMG through all of the wrongful conduct described above.

113.    Defendants have undertaken such conduct with the intent to cause injury to TMG.

114.    Defendants' conduct described herein is generally culpable and not justifiable under the circumstances.

115.    As a direct and proximate result of Defendants' tortious conduct, TMG has suffered damages.

116.    As such, Defendants are liable to TMG for compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

## COUNT XI
## (BY TMG AGAINST McCABE FOR FRAUDULENT INDUCEMENT TO CONTRACT)

117.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "116" hereof as if set forth in full herein.

118.    In order to induce TMG to enter into the Modification Agreement, McCabe made the representations to TMG detailed in paragraph 46 above.

119.    Each of the representations made by McCabe were material to TMG's decision to enter into the Modification Agreement.

120.    McCabe made the representations with the intent that TMG would rely upon them in determining to enter into the Modification Agreement.

121.    McCabe's representations were false, as described above in paragraphs 48 through 49.

122.    McCabe was aware of the falsity of his representations at the time that the representations were made.

123.    TMG actually relied on McCabe's representations when it entered into the Modification Agreement. TMG's reliance on McCabe's representations was reasonable in that TMG had no knowledge of the falsity of the representations and had no reason to know that the representations were false.

124.     McCabe's actions in making the above misrepresentations to TMG as an inducement to enter into the Modification Agreement was malicious, oppressive and fraudulent.

125.     Because of McCabe's fraud, TMG is entitled to rescission of the Modification Agreement.

126.     By reason of McCabe's fraudulent inducement of TMG to enter into the Modification Agreement, TMG has sustained and will continue to sustain substantial damages consisting of the loss of Bacardi as a client of TMG and of TMG's out-of-pocket expenses incurred in connection with the negotiation, drafting and execution of the Modification Agreement.

127.     As a direct and proximate result of McCabe's fraudulent conduct, the Modification Agreement should be rescinded and TMG awarded compensatory and punitive damages in an amount to be determined at trial, but in no event less than $10,000,000.

128.     TMG has no adequate remedy at law.

## COUNT XII
## (BY TMG AGAINST ALL DEFENDANTS FOR AN ACCOUNTING)

129.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "128" hereof as if set forth in full herein.

130.     As set forth above, Defendants have all participated in, or been the beneficiaries of, wrongful conduct committed by the Defendants against TMG.

131.     By reason of the foregoing, Defendants are required to account to TMG for the profits realized at TMG's expense including all revenue generated by Defendants in connection with their theft and misuse of TMG's confidential and proprietary information and trade secrets, so that TMG can determine the totality of its damages.

132.     TMG has no adequate remedy at law for the relief requested by this cause of action.

**COUNT XIII**
**(BY TMG AGAINST ANGEL AND MOFFITT FOR INDEMNIFICATION)**

133.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "132" hereof as if set forth in full herein.

134.     Paragraph 13 of the Termination Agreement requires Angel and Moffitt to indemnify TMG for its reasonable attorneys' fees incurred in connection with a dispute arising out of "any breach of any representation, warranty, agreement or covenant set forth in [the Termination Agreement] or any act or omission arising in connection with [the Termination Agreement]".

135.     TMG's claims against Angel and Moffitt constitute disputes under the Termination Agreement arising out of breaches, acts and/or omissions in connection with the Termination Agreement.  Upon information and belief, TMG will incur more than $75,000 in attorneys' fees in connection with the prosecution of these claims.

136.     By reason of the foregoing, TMG is entitled to indemnification from Angel and Moffitt for the reasonable attorneys' fees incurred by TMG in this action following a final adjudication.

**WHEREFORE**, plaintiffs, The Management Group, LLC, Andrew Fox and Lee Heiman, demand judgment against defendants, Angel Music Group Ltd., Neil Moffitt, and Nick McCabe, Jessie Angles, Anu Dhami, Isabel Piaggi, and Dan A. Vidal, as follows:

(a)     On the first count for a permanent injunction, enjoining, restraining and/or directing Moffitt to:  (a) stay away from Messrs. Fox and Heiman, their wives, children and/or other family members at any and all locations, including, but not limited to, their homes, places

of business, schools and/or day care centers; (b) refrain from communicating with Messrs. Fox and Heiman, their wives, children and/or other family members by any means whatsoever, including, but not limited to, mail, facsimile, email, telephone and voicemail; (c) refrain from assaulting, stalking, harassing, menacing, recklessly endangering, intimidating, threatening or annoying Messrs. Fox and Heiman, their wives, children and/or other family members; and (d) refrain from making any statements, whether written or oral, public or private, that disparage, denigrate or defame Messrs. Fox and/or Heiman, their wives, children and/or other family members.

(b)    On the second count for a permanent injunction, enjoining and restraining Defendants from:  (a) soliciting TMG's employees; (b) unfairly competing with TMG; and (c) using TMG's confidential and proprietary information;

(c)    On the third count for breach of contract, awarding TMG compensatory damages against Angel, Moffitt and McCabe according to the proof, but in any event, in an amount no less than $10,000,000;

(d)    On the fourth count for breach of fiduciary duty, awarding TMG compensatory and punitive damages against defendants Moffitt, McCabe, Angles, Dhami, Piaggi and Vidal, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(e)    On the fifth count for aiding and abetting breach of fiduciary duty, awarding TMG compensatory and punitive damages against defendant Angel according to the proof, but in any event, in an amount no less than $10,000,000;

(f)    On the sixth count for unfair competition, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(g)    On the seventh count for conversion, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(h)    On the eighth count for misappropriation of trade secrets, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(i)    On the ninth count for tortious interference with contractual and business relationships, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(j)    On the tenth count for *prima facie* tort, awarding TMG compensatory and punitive damages against Defendants, jointly and severally, according to the proof, but in any event, in an amount no less than $10,000,000;

(k)    On the eleventh count for fraudulent inducement to contract, rescinding the Modification Agreement and awarding TMG compensatory and punitive damages against McCabe, according to the proof, but in any event, in an amount no less than $10,000,000;

(l)    On the twelfth count for an accounting, requiring Defendants to account to TMG for the total amount of revenue generated by Defendants in connection with their theft and misuse of TMG's confidential and proprietary information and trade secrets;

(m)    On the thirteenth count for indemnification, awarding TMG reasonable attorneys' fees against Angel and Moffitt upon the final adjudication of this action; and

(n)    All together with prejudgment interest, the costs and disbursements of this action,

including reasonable attorneys' fees, and for such other and further relief as the Court may deem

just and proper.

Dated: New York, New York
        April 25, 2008

DAVIDOFF MALITO & HUTCHER LLP

By:  _____
        Larry Hutcher
        Peter M. Ripin
        Gary I. Lerner

*Attorneys for Plaintiffs*
605 Third Avenue
New York, New York 10158
(212) 557-7200